# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

## CONCISE SUMMARY OF THE CASE

Pursuant to 3rd Cir. LAR 33.3, counsel are required to file a concise summary of the case within **14** days of the date of docketing of the Notice of Appeal. Total statement is limited to no more than 2 pages, single-spaced. Counsel may utilize this form or attach a 2 page statement encompassing the information required by this form.

SHORT CAPTION: Novartis AG, et al. v. Novadoz Pharmaceuticals LLC, et al.

USCA NO.: 25-2346

LOWER COURT or AGENCY and DOCKET NUMBER:
D.N.J., No. 2:25-cv-00849

NAME OF JUDGE: Hon. Evelyn Padin

Specify who is suing whom, for what, and the subject of this action. Identify (1) the nature of the action; (2) the parties to this appeal; (3) the amount in controversy or other relief involved; and (4) the judgment or other action in the lower court or agency from which this action is taken:

Plaintiffs-Appellants Novartis AG and Novartis Pharmaceuticals Corp. ("Novartis") bring trade dress, trademark, false designation of origin, and New Jersey unfair competition claims against Defendants Novadoz Pharmaceuticals LLC, MSN Pharmaceuticals Inc. and MSN Laboratories Private Limited ("MSN") based on MSN's generic versions of Novartis's heart-failure drug ENTRESTO that copy the size, shape, and color of Novartis's pills and will be distributed under the Novadoz name. Novartis seeks monetary damages, injunctive relief, and declaratory relief.

Novartis appeals the district court's denial of Novartis's motion for a preliminary injunction.

LIST and **ATTACH** a copy of each order, judgment, decision or opinion which is involved in this appeal. If the order(s) or opinion(s) being appealed adopt, affirm, or otherwise refer to the report and recommendation of a magistrate judge or the decision of a bankruptcy judge, the report and recommendation or decision shall also be attached.

Exhibit A is the district court's July 15, 2025 Opinion denying Novartis's motion for a preliminary injunction (Dkt. 57);
Exhibit B is the district court's July 15, 2025 Order denying Novartis's motion for a preliminary injunction (Dkt. 58);
Exhibit C is the district court's May 22, 2025 Opinion staying its preliminary injunction pending appeal (Dkt. 51);
Exhibit D is the district court's May 22, 2025 Order staying its preliminary injunction pending appeal (Dkt. 52);
Exhibit E is the district court's March 17, 2025 Opinion granting Novartis's motion for a preliminary injunction (Dkt. 32);
Exhibit F is the district court's March 17, 2025 Order granting Novartis's motion for a preliminary injunction (Dkt. 33).

Provide a short statement of the factual and procedural background, which you consider important to this appeal:

Novartis sued MSN after discovering MSN was planning to sell generic versions of Novartis's heart-failure drug ENTRESTO® in ways that would infringe Novartis's trade dress and trademark rights and violate state and federal laws. Novartis sought a preliminary injunction to prevent irreparable harm and protect the public while Novartis's suit proceeds. The district court originally granted Novartis a preliminary injunction but then later reconsidered and denied the preliminary injunction.

Identify the issues to be raised on appeal:

Whether the district court's denial of a preliminary injunction should be reversed.

This is to certify that this Concise Summary of the Case was electronically filed with the Clerk of the U.S. Court of Appeals for the Third Circuit and a copy hereof served to each party or their counsel of record

this __30th__ day of __July__ ,20__25__ .

/s/ Deanne E. Maynard
_____
Signature of Counsel

Rev. 07/2015

# EXHIBIT A

<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NOVARTIS AG and NOVARTIS PHARMACEUTICALS CORP., | |
| Plaintiffs, | No. 25cv849 (EP) (JRA) |
| v. | **OPINION** |
| NOVADOZ PHARMACEUTICALS LLC *et al.*, | |
| Defendants. | |

**PADIN, District Judge.**

This matter comes before the Court by way of Plaintiffs Novartis AG and Novartis Pharmaceuticals Corporation's (together, "Novartis") motion for a preliminary injunction against Defendants MSN Laboratories Private Limited, MSN Pharmaceuticals Inc., and Novadoz Pharmaceuticals LLC (collectively, "MSN") for alleged infringement of Novartis's trademark, trade dress, and state rights. D.E. 4 ("PI Motion" or "PI Mot."). Novartis also moves for an injunction pending appeal. D.E. 54. The Court decides the Motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78. l(b).

Upon *sua sponte* reconsideration of this Court's prior Opinion and Order entered on March 17, 2025, D.E. 33, the Court will reverse its prior ruling with respect to trade dress infringement and, accordingly, for the reasons set forth below, will **DENY** Novartis's Motion for a Preliminary Injunction and **DENY** Novartis's Motion for an Injunction Pending Appeal.

## I.    BACKGROUND

Entresto[1] is an FDA-approved heart failure prescription medication that delivers a combination of two drugs: sacubitril and valsartan.  Since its launch in 2015, it has been the most popular heart failure branded medication and has successfully helped over 2.5 million patients avoid death and hospitalization.  D.E. 1 ("Compl.") ¶¶ 3, 52-53.  Entresto is available in three doses that each vary in configuration.  The "Low Starting Dose" is a violet white oval tablet that measures 13.1 mm x 5.2 mm and contains a 24/26 mg dose.  *Id.* ¶¶ 15, 59.  The "Recommended Starting Dose" is a pale yellow oval tablet that measures 13.1 mm x. 5.2. mm and contains a 49/51 mg dose.  *Id.*  The "Target Dose" is a light pink oval tablet that measures 15.1 mm x 6.0 mm and contains a 97/103 mg dose.  *Id.*  Each tablet is marked with "NVR."  D.E. 4-4 ("Valazza Decl.") ¶ 15.

Upon the expiration of Novartis's patent-related exclusivity on July 16, 2025, MSN intends to market a generic version of Entresto under MSN's "Novadoz" name.  Compl. ¶¶ 6-7, 89; D.E. 49.  As mandated by law, MSN's generic will contain the same active ingredients as Entresto, be available in the same dosage forms, and will deliver the same doses.  D.E. 13-7 ("Nithiyanadam Decl.") ¶¶ 3-5.  However, its dimensions, coloring, and markings will differ slightly.  The proposed dimensions for MSN's generic measure at 10 x 4 mm, 13 x 5.10 mm, and 15 x 5.9 mm respectively for its 24/26 mg tablet, 49/51 mg tablet, and 97/103 mg tablet.  *Id.* ¶ 6.  The proposed tablets are marked with an "M", slightly smaller, and similar in coloring, though not identical to Entresto.

---

[1] Novartis refers to Entresto as "ENTRESTO®" in its briefing.  *See generally* PI Mot., D.E. 17 ("PI Reply").  The Court refers to Novartis's drug as "Entresto" here.

| PARAMETERS | REFERENCE LISTED DRUG | PROPOSED DRUG PRODUCT |
|---|---|---|
| Strengths | 24 mg/ 26 mg, 49 mg / 51 mg and 97 mg/ 103 mg | 24 mg/ 26 mg, 49 mg / 51 mg and 97 mg/ 103 mg |
| Configuration | | |
| 24 mg/ 26 mg, 49 mg / 51 mg and 97 mg/ 103 mg | Bottle of 60's and 180's | Bottle of 60's and 180's |
| 24 mg/ 26 mg |  |  |
| 49 mg/ 51 mg |  |  |
| 97 mg/ 103 mg |  |  |
| Dimensions | | |
| 24 mg/ 26 mg | 13.35 x 5.33 | 10.00 X 4.00 mm |
| 49 mg/ 51 mg | 13.25 x 5.30 | 13.00 X 5.10 mm |
| 97 mg/ 103 mg | 15.34 x 6.12 | 15.00 X 5.90 mm |
| Active Ingredient | Sacubitril and Valsartan | Sacubitril and Valsartan |

*Id.*

## II.     PROCEDURAL HISTORY

On January 31, 2025, Novartis moved for a preliminary injunction seeking to enjoin the market entry of MSN's generic.[2]  PI Mot.  MSN opposed,  D.E. 13 ("PI Opp'n"), and Novartis replied, PI Reply.  On March 17, 2025, this Court concluded that although Novartis had not shown that it was likely to succeed on the merits of its trademark infringement and state law claims, it was likely to succeed on its trade dress infringement claim.  D.E. 32 ("PI Opinion") at 18, 21. After additionally concluding that other preliminary injunction factors favored Novartis, this Court granted a preliminary injunction enjoining MSN from infringing Novartis's trade dress rights.  *Id.* at 17-18; D.E. 33 ("PI Order").

On March 24, 2025, MSN appealed the grant of a preliminary injunction to the Third Circuit.  D.E. 35.  On April 4, 2025, this Court issued a text order advising the parties that it was

---

[2] Novartis also contemporaneously moved for a temporary restraining order, which this Court denied.  D.E. 7.

contemplating *sua sponte* reconsideration of the PI Opinion and it provided the parties an opportunity to submit further briefing. D.E. 43. Both parties responded. D.Es. 45-46. MSN's appeal to the Third Circuit, however, had divested this Court of jurisdiction and rendered this Court unable to reconsider the PI Opinion. *See* D.E. 51 at 4 n.1 (citing *Venen v. Sweet*, 758 F.2d 117, 120 (3d Cir. 1985)).

On May 22, 2025, this Court did, however, stay its injunction pending MSN's appeal. D.Es. 51 ("Stay Opinion"), 52. The Court concluded that MSN was likely to succeed on the merits of its appeal because the Court had improperly applied governing law regarding Novartis's trade dress infringement claim. Stay Opinion at 4-5 & n.2 (citing *Thompson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, No. 20-613, 2025 WL 458520, at *1 (D. Del. Feb. 11, 2025)). In light of the procedural posture and this Court's Stay Opinion, the Third Circuit issued a limited remand to permit this Court's reconsideration of its PI Opinion. *Novartis AG v. Novadoz Pharms. LLC*, No. 25-1550, D.E. 28 (3d Cir. 2025). The Court now has jurisdiction and issues its reconsidered opinion with respect to Novartis's trade dress claim.[3] Novartis also seeks an injunction pending appeal of this Court's reconsidered opinion. D.E. 54.

---

[3] Novartis also brought claims for trademark infringement, false designation of origin, and unfair competition. Compl. ¶¶ 128-205. The Court denied Novartis's request for a preliminary injunction with respect to those claims after concluding it had not demonstrated likelihood of confusion, a prerequisite for each claim. *See Checkpoint Sys., Inc. v. Check Point Software Tech., Inc.*, 269 F.3d 270, 279 & n.5 (3d Cir. 2001) (explaining that trademark infringement and unfair competition share the same elements and consequently, the same analysis); *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 226 (3d Cir. 2017) (explaining that a false designation of origin claim in turn relies upon "proving the existence of a protectable mark" under the Lanham Act) (quoting *E.T. Browne Drug Co. v. Cococare Prod., Inc.*, 538 F.3d 185, 191 (3d Cir. 2008)). The Court reconsiders its PI Opinion only with respect to the preliminary injunction it granted to prevent trade dress infringement. The Court does not disturb its other findings.

### III.    RECONSIDERATION

Although a district court "should be loathe to do so," it has discretion to revisit prior decisions of its own and should do so "where a prior ruling . . . might lead to an unjust result." *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009) (quoting *Messenger v. Anderson*, 225 U.S. 436, 32 (1912)). A district court that decides to change an earlier ruling—as this Court will do here—must "state [its] reasons on the record" and "take appropriate steps so that the parties are not prejudiced by reliance on the prior ruling." *Id.* (quoting *Swietlowich v. County of Bucks*, 610 F.2d 1157, 1164 (3d Cir. 1979)).

Novartis asks this Court to enjoin the entry of a would-be generic competitor. This Court granted that extraordinary relief and enjoined MSN's market entry and, by extension, the potential market entry of other "strikingly similar" generics. PI Opinion at 3, 21; *see also* Nithiyandam Decl. ¶ 18 (explaining that "the appearance of every other FDA-approved Entresto generic drug for which that information is publicly available" mimics the appearance of Entresto). The grant of that extraordinary relief was error. The Court imposed too high a standard in its assessment of non-functionality, did not take the nature of Novartis's product configuration trade dress claim into account for secondary meaning or likelihood of confusion, and did not apply the correct legal framework when evaluating irreparable harm. While there may be circumstances where a generic competitor should be excluded from the market because of trade dress infringement, the Court is satisfied that this case does not present such circumstances. As Novartis explains, the life-saving drug at issue here may impact millions of patients and is responsible for generating billions in

sales.[4]  D.E. 4-3 ("Miller Decl.") ¶¶ 20, 25-26.  Accordingly, the Court concludes that reconsideration of its prior trade dress ruling is warranted here to prevent injustice.

## IV.    LEGAL STANDARD

A preliminary injunction is "'an extraordinary remedy' and 'should be granted only in limited circumstances.'"  *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)).  Such extraordinary relief should be granted only if a party shows:

> (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.

*Id.* (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999)).  Although the first two factors are particularly critical, *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), a party's "failure to establish any element in its favor renders a preliminary injunction inappropriate," *Conestoga Wood Specialties Corp. v. Secretary of U.S. Department of Health and Human Services.*, No. 13-1144, 2013 WL 1277419, at *1 (3d Cir. Feb. 8, 2013) (internal quotations omitted).  The same standard also applies to injunctions pending appeal under Fed. R. Civ. P. 62(d).  *Newborn Bros. Co., Inc. v. Albion Engineering Co.*, No. 12-02999, 2024 WL 2720461, at *2 (D.N.J. May 28, 2024) (citing *Conestoga Wood*, 2013 WL 1277419, at *1).

---

[4] Entresto is an important drug for millions of patients.  *See* D.E. 4-1 at 20 ("ENTRESTO® is a blockbuster drug taken twice a day, indefinitely, by over 2.5 million patients."); *see also* D.E. 42 at 2 (explaining that Entresto "is the number one branded heart failure treatment prescribed by physicians" and is a "life changing heart failure medication"); D.E. 13-40 ("Clark Decl.") ¶ 31 ("Entresto contributed approximately $3 billion (or 17%) of Novartis's $ 18.1 billion in U.S. sales."), ¶ 37 (Entresto is "the leading branded therapy for heart failure prescribed by cardiologists and is recommended for first-line treatment of CHF in guidelines from the American Heart Association, American College of Cardiology, and the Heart Failure Society of America.").

V.    **ANALYSIS**

A.    **Likelihood of Success**

Novartis seeks to enjoin MSN from infringing its trade dress, in violation of the Lanham

Act § 1125(a).  To succeed on a trade dress infringement claim, Novartis must prove:

> (1) the allegedly infringing design is nonfunctional; (2) the design is inherently
> distinctive or has acquired secondary meaning; and (3) consumers are likely to
> confuse the source of the plaintiff's product with that of the defendant's product.

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007).  For

the reasons explained below, the Court finds that Novartis is unlikely to succeed on the merits of

its trade dress infringement claim because the trade dresses are functional, have not acquired

secondary meaning, and consumers are not likely to confuse the source of Novartis's and MSN's

tablets based upon trade dress.

*1.    Functionality*

Trade dress is a type of trademark.  It serves to protect distinctive choices "like size, shape,

and color" that are responsible for "the overall look of a product."  *PIM Brands, Inc. v. Haribo of*

*Am. Inc.*, 81 F.4th 317, 321 (3d Cir. 2023) (quoting *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l*

*Am. Corp.*, 986 F.3d 250, 255 (3d Cir. 2021)).  Trade dress does not, however, protect functional

features.  *Id.*  Functionality falls within the purview of patent law, where the law works to foster

innovation.  *Shire US Inc. v. Barr Lab'ys, Inc.*, 329 F.3d 348, 353 (3d Cir. 2003).  The Lanham Act

seeks to accomplish somewhat different goals.  The Lanham Act "protects the manufacturer (and

the consumer) from the copying of those features that signify a product's source (and quality) and

encourages competition by preventing one manufacturer from acquiring a monopoly by attempting

to trademark those features of a design [useful] to a successful product of that type."[5]  *Id.* (quoting *Standard Terry Mills, Inc. v. Shen Mfg. Co.*, 803 F.2d 778, 780-81 (3d Cir. 1996)).

The standard for finding functionality is supposed to be low.  *PIM Brands*, 81 F.4th at 321.  "A design is functional if it is useful for *anything* beyond branding."  *Id.* (emphasis added).  That includes features which "would put competitors at a significant non-reputation-related disadvantage."  *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995).  Indeed, the Supreme Court in *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, cautioned courts against the "misuse or overextension of trade dress."  523 U.S. 23, 29 (2001) (citing *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 120 (2000)); *see also Shire*, 329 F.3d at 359 n.22 (explaining that "in many instances there is no prohibition against copying goods and products") (quoting *TrafFix*, 532 U.S. at 29).

Against this backdrop, the Court notes that prescription drugs raise at least two unique issues for trade dress law.  *First*, modern generic drugs like MSN's must meet stringent FDA standards, allaying trade dress policy concerns that seek to protect manufacturers and consumers from relying on "the overall look of a product" to indicate quality.  *See Shire*, 329 F.3d at 355 n.14; *see also id.* at 356 n.17.[6]  Indeed, "drug color cases have more to do with public health policy regarding generic drug substitution than with trademark law."  *Id.* (quoting *Qualitex*, 514 U.S. at

---

[5] "Functional designs need not be *essential*, just useful."  *Ezaki Glico*, 986 F.3d at 256 (emphasis added).

[6] "A generic medicine is required to be the same as a brand-name medicine in dosage, safety, effectiveness, strength, stability, and quality, as well as in the way it is taken.  Generic medicines also have the same risks and benefits as their brand-name counterparts."  Clark Decl. at ¶ 26 (quoting U.S. FOOD & DRUG. ADMIN., GENERIC DRUG FACTS, FDA (2021), available at https://www.fda.gov/drugs/generic-drugs/generic-drug-facts).

169).  This alone distinguishes pre-Hatch-Waxman trade dress cases from those that post-date it.[7]
*See id.* at 356 n.17 (collecting cases).

*Second*, for many patients, the overall look of a drug can "come to represent to large numbers of those taking [the drug] not its source but its ingredients and their effects."  *Id.* at 358 n.20;  *see also Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 853 (1982).  This association—tied to the drug product's overall appearance—can confer functionality for patient populations who rely on appearance to identify their medication and would put competitors at a significant disadvantage if they cannot replicate or approximate those features.  *See Qualitex*, 514 U.S. at 170 (stating in dicta that color serves "a significant nontrademark function" if it serves "to distinguish a heart pill from a digestive medicine").  Even the FDA prefers that generics look like their reference drug counterparts.  *See* U.S. Food & Drug Admin., Size, Shape, and Other Physical Attributes of Generic Tablets and Capsules: Guidance for Industry (2022), available at https://www.fda.gov/media/161902/download (hereinafter "FDA Physical Attribute Guidance") at 1 (expressing "concer[n] that differences in physical characteristics (e.g., size and shape of the tablet or capsule) may affect patient compliance and acceptability of medication regimens or could lead to medication errors.").

"In a civil action for trade dress infringement under this chapter for trade dress nor registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."  15 U.S.C. § 1125(a)(3).  As

---

[7] The Hatch-Waxman Act was passed in 1984, which caused an explosive change in the drug marketplace.  Before Hatch-Waxman, less than twenty percent of total prescriptions dispensed were generic drugs.  H.R. Rep. No. 98-857, pt. 1, at 28 (1984); 130 Cong. Rec. 24,430 (1984) (statement of Rep. Waxman).  Today, nine out of ten prescriptions are filled with generic drugs.  U.S. Food & Drug Admin., Generic Drugs (2021), available at https://www.fda.gov/drugs/buying-using-medicine-safely/generic-drugs.

Novartis has no registered trade dress, it is Novartis's burden to prove non-functionality.  *Id.*  For the reasons explained below, the Court concludes that Novartis has not shown that the Entresto trade dresses are nonfunctional.

> a.    *Arbitrary selection is not dispositive*

The Supreme Court explained in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, that the colors of a medication—although "arbitrarily selected"—may nonetheless be

> functional to patients as well as doctors and hospitals; many elderly patients associate color with therapeutic effect; some patients comingle medications in a container and rely on color to differentiate one from another; colors are of some, if limited, help in identifying drugs in emergency situations; and use of the same color for brand name drugs and their generic equivalents helps avoid confusion on the part of those responsible for dispensing drugs.

456 U.S. 844, 846-47, 853 (1982).  *Inwood Laboratories* thus indicates that utility for healthcare providers, as well as patients, is relevant to functionality.   Following the Supreme Court's reasoning, it is the Court's view that although "there may have been no functional reason [for Novartis] to have chosen violet white, pale yellow, and light pink tablets in the first instance, the tablet's appearances, once chosen can 'come to represent to large numbers of those taking [the drugs] not its source but its ingredients and effects.'"  Stay Opinion at 9 (quoting *Shire*, 329 F.3d at 358 n.20).  Indeed, the Supreme Court has cautioned that "product design almost invariably serves purposes other than source identification."  *Wal-Mart*, 529 U.S. at 213.  Therefore, evidence that the colors of Entresto were "arbitrary design choices," PI Mot at 17, selected for reasons "unrelated to function or efficacy" is not dispositive,  Valazza Decl. ¶ 17.

> b.    *Visual cues have functional utility*

Entresto patients raise the same functionality concerns as those discussed by the Supreme Court in *Inwood Laboratories* and the Third Circuit in *Shire*.  For example, the majority of chronic heart failure ("CHF") patients take five or more medications and may rely on color and overall

appearance to distinguish among their various medications.  Clark Decl. ¶ 75; D.E. 13-46 ("Shimer Decl.") ¶ 48; D.E. 4-10 ("Robbins Decl.") ¶ 16.  And because CHF is a chronic condition, patients typically take their CHF medication "into seeming perpetuity" and come to expect visual continuity, even after switching to a generic.  PI Opinion at 9; *see also* Robbins Decl. ¶¶ 13-15; Miller  Decl. at ¶¶ 18-20; Clark Decl. ¶¶ 20, 53; Shimer Decl. ¶ 47.

These visual cues are important for therapeutic adherence.  Generics purposefully and routinely mimic the overall appearance of reference drugs to avoid disrupting visual continuity in a patient's drug regimen.[8]  Clark Decl. ¶ 21; Shimer Decl. ¶ 45.  The effect is not insubstantial. *Shire*, 329 F.3d at 358 n.21 (noting that "'the constancy of color and shape may be psychologically reassuring and therefore as medically beneficial as the drug itself'") (quoting *Inwood Lab'ys*, 456 U.S. at 862 n.3 (White, J., concurring)); *see also id.* at 358 (affirming district court's factual finding that "similarity in tablet appearance enhances patient safety by promoting psychological acceptance").

The Court does not find Novartis's arguments to the contrary persuasive.  *First*, Novartis relies on pre-*Shire* cases finding that the overall appearance of prescription drugs was not functional.  PI Mot. at 17.  But as this Court explained above, these pre-Hatch-Waxman cases are

---

[8] This increasingly common industry practice also distinguishes the pre-Hatch-Waxman cases cited by Novartis. *See SK & F, Co. v. Premo Pharm. Lab'ys, Inc.*, 625 F.2d 1055, 1064 (3d Cir. 1980) (finding that a drug's color conferred no functionality in part because there was "ample evidence that neither the capsule form nor the color combination reflects any industry practice . . . ."). Here, however, there is evidence demonstrating that generics routinely—although not always—mirror or approximate the overall appearance of the reference drug. Nithiyanadam Decl. ¶ 6; *see also* Clark Dec. ¶ 102 (comparing physical features between generic drugs and reference drugs). Indeed, MSN identified four other Entresto generics that also use small ovaloid off white, light or pale yellow, and light pink tablets for their three strengths. D.E. 13-8; *see also* PI Opp'n at 8 n.4 ("[S]o far as can be gleaned from publicly available information, every other ANDA applicant for a generic Entresto product . . . also use[s] a similar light purple, pale yellow, and light pink color scheme, and also use[s] an ovaloid shape.").

distinguishable.  *See supra* section V.A.1.  Novartis particularly relies on *Ciba-Geigy Corp. v. Bolar Pharmaceuticals, Co., Inc.*, but the Third Circuit there did not address the functionality arguments raised here, and which were later credited by *Shire*.  *Compare Ciba-Geigy*, 747 F.2d 844, 850-51 (3d Cir. 1984) (affirming non-functionality because Bolar's functionality arguments "were premised primarily on the assumption that physicians and pharmacists would prescribe a drug based on its appearance only"), *with Shire*, 329 F.3d at 355 (affirming functionality because similarity in appearance "enhances patient safety and compliance with the medically prescribed dosing regimen").

*Second*, Novartis relies on its expert declarations, but their statements are not compelling. Dr. Robbins opines that the FDA's recommendations regarding a generic drug's mirroring of a reference drug's physical attributes do not include specific guidance regarding color choices and that the FDA's recommendations stem from "ease of swallowing" concerns.  D.E. 17-2 ("Robbins Rebuttal Decl.") ¶¶ 10-11 (internal quotations omitted) (citing FDA Physical Attribute Guidance at 4).  But the FDA's recommendations are not limited to "ease of swallowing concerns."  The FDA also recommends considering "patient compliance and acceptability of medication regimens"—a function recognized by *Shire*.  FDA Physical Attribute Guidance at 1, 4; *Shire*, 329 F.3d at 355.

Dr. Robbins further contends that MSN's expert Dr. Shimer's reliance on the FDA's Physical Attribute Guidance is misplaced because the FDA admits that "generic medicines may look different than the brand-name drugs they duplicate" and because Dr. Shimer's own publications find that the most generic drugs differ in at least one of four physical attributes examined compared to the reference drug.[9]  Robbins Rebuttal Decl. ¶¶ 11-12.  But a product's

---

[9] Dr. Clark looked at color, shape, score, size, and imprint code.  Clark Decl. ¶¶ 102-03.

appearance can be functional "even when there are alternatives." *Ezaki Glico*, 986 F.3d at 260. And Dr. Robbins himself admits that a pill's overall appearance can "serve as a reference point for patients to identify the particular medication they are prescribed." Robbins Decl. ¶ 17.

Finally, Dr. Robbins states that Dr. Clark overlooks other factors that impact patient adherence. Robbins Rebuttal Decl. ¶ 13. The Supreme Court, however, made clear that a feature need not be functional for every consumer when it found functionality in *Inwood Laboratories* based upon evidence that "*some* patients commingle medications in a container and rely on color to differentiate one from another." *Inwood Lab'ys*, 456 U.S. at 853. Nor does the law require that a feature be functional in all aspects. The functionality bar is low. It does not matter that other features may impact patient adherence. The fact that overall appearance is useful is enough. *Ezaki Glico*, 986 F.3d at 256.

Considering the full record, the appearance of Entresto is functional because elderly patients and patients with comorbidities (i.e., many of the patients who take Entresto) rely on visual cues to help identify the effects of and distinguish their heart failure medication. Stay Opinion at 9-10 (quoting PI Opinion at 9). And because those patients rely on overall appearance for visual continuity, which impacts patient adherence, generic competitors would suffer a significant disadvantage if they could not mirror those features. *Inwood Lab'ys*, 456 U.S. at 853; *see also Qualitex*, 514 U.S. at 169 ("The functionality doctrine thus protects competitors against a disadvantage . . . namely, their inability reasonably to replicate important non-reputation-related product features.").

### c. Dosage coding is functional

Novartis's use of different colors and sizes across different dosages is functional as well. Patients begin on lower doses of Entresto before progressing up to different and higher dosage

strengths. D.E. 4-11 ("Nayeri Decl.") ¶ 17. Distinguishing the different dosage strengths by color and by size permits patients who are exposed to more than one dosage strength over the course of their treatment to rely on color and size to visually convey dosage information. *See* PI Mot. at 10 ("some patients progress through the various doses of Entresto, exposing them to the Trio Trade Dress over time"); *see also* Clark Decl. ¶ 48; Nithiyanandam Decl. ¶ 10; Nayeri Decl. ¶ 17. Therefore, just as the Third Circuit found in *Shire*, the Court here finds that the record supports that distinguishing between the different dosages "confers a substantial degree of clinical functionality for the patient in the titration/adjustment process." *Shire*, 329 F.3d at 354.

> ### d.    Size and shape are functional in additional ways

The size and shape of Entresto are functional too. Here, MSN again marshals compelling evidence demonstrating that the size and ovaloid shape of Entresto influence patient administrability, manufacturing costs, and transit time after ingestion. MSN's expert, Dr. Nithiyanandam points out that "hundreds if not thousands of other drug companies choose an ovaloid shape for their tablets" because ovaloid shapes are easier to swallow and more cost-effective to manufacture. Nithiyanandam Decl. ¶ 12. The FDA similarly lauds ovaloid shapes as "easier to swallow." Shimer Decl. ¶ 41 (citing FDA's Physical Attribute Guidance at 3, 5-6). The same goes for size. Smaller tablets are easier to swallow, and FDA Guidance demonstrates that tablet size affects esophageal transit time. *Id.*

Novartis does not dispute that size and shape matter. PI Mot. at 17-20; PI Reply at 3-5. Novartis instead maintains that it chose the size and shape of Entresto to distinguish it from competing products. PI Reply at 2, 3. But as explained above in section V.A.1, just because Novartis selected a particular product design to distinguish its product in the market does not compel the conclusion that the product design lacks functionality.

2.    *Secondary Meaning*[10]

Because Novartis does not argue that the overall appearance of Entresto is inherently distinctive, the Court addresses only whether the Entresto trade dresses have acquired secondary meaning. PI Mot. at 19. A trade dress acquires secondary meaning when "in the minds of the consuming public, [it serves] to identify the *product's source* rather than the *product itself*." *Wal-Mart*, 529 U.S. at 205-06 (emphasis added).[11] The Third Circuit has identified several non-exclusive factors relevant to secondary meaning:

> (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion.

---

[10] MSN raises the argument that because Novartis's trade dresses are generic, it is ineligible for trade dress protection. PI Opp'n at 17. MSN points to extensive use of the trade dress features across the entire pharmaceutical industry. D.E. 13-23; Nithiyandam Decl. ¶ 12, Clark Decl. ¶¶ 83-84. Because the Court finds that the trade dresses are functional and there is no secondary meaning, it will not address MSN's genericness argument.

[11] Here, the consuming public includes both patients and healthcare providers. Although the Court considers both groups in its analysis here and for likelihood of confusion, *see infra* section V.A.3, the Court's analysis sometimes focuses on the end-user as opposed to the product selector where appropriate (and based on the parties' evidence which, at times, is limited to only one group or the other). *See Kos Pharms.*, 369 F.3d at 715 & n.12 (noting that healthcare providers and patients may both make up the market in prescription drug cases).

*Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 231 (3d Cir. 2017). The Court, however, notes that because Novartis's trade dress claim "is predicated upon infringement of the trade dress of the product itself" (as opposed to the packaging of the product), this is a product configuration case. *See Duraco Prods. Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1434 & 1439 (3d Cir. 1994) (explaining that product configuration applies when "the total image of a product, including features such as size, shape, color or color combinations, texture, graphic, or even particular sales techniques" are at issue).[12]

Because "product configurations in general are not reliable as source indicators," they raise unique challenges for trademark law. *Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 201 (3d Cir. 1995) (citing *Duraco*, 40 F.3d at 1441, 1448-49, 1451); *see Duraco*, 40 F.3d at 1440-42 (holding that "the particularity of trademarks . . . does not fit the quite different considerations applicable to product configurations"); *see also Versa*, 50 F.3d at 202 ("[T]he law of trade dress in product configurations will differ in key respects from the law of trademarks or of trade dress in product packaging . . . ."). As the Supreme Court explained in *Wal-Mart Stores*, "[i]n the case of product design . . . consumer predisposition to equate the feature with the source *does not exist*." 529 U.S. at 213 (emphasis added). "[A]lmost invariably, even the most unusual product designs—such as a cocktail shaker shaped like a penguin—is intended not to signify the source, but to render the product itself more useful or more appealing." *Id.*

---

[12] The law sometimes refers to the overall product's design as "product configuration" or as "product design." *Compare Duraco*, 40 F.3d 1431 (using the term "product configuration"), *Versa*, 50 F.3d 189 (using the term "product configuration"), *and Shire*, 329 F.3d 348 (using the term "product configuration" to refer to a product's appearance), *with Wal-Mart*, 529 U.S. 205 (using the term "product design" to refer to a product's appearance), *and Buzz Bees Toys, Inc. v. Swimways Corp.*, 20 F. Supp. 3d 483 (D.N.J. 2014) (using both terms).

A different approach in the product configuration context must therefore apply compared to trademark cases and product packaging cases. *See Duraco*, 40 F.3d at 1447 ("even the basic design of a light bulb is capable of identifying a particular source of a product . . . assuming that only one manufacturer produces the basic design, a fact which would be assured, of course, if the design were protected against copying"). Taking this context into account and as further discussed below, Novartis has not shown that the consuming public understands the overall appearance of Entresto to primarily identify Novartis.

a.     *Extent of advertising and sales*

Generally, the public comes to associate a trade dress with a product's source "through extensive advertising." *Tyson Foods*, 863 F.3d at 232. A "prevalent advertising campaign" that runs for an extended period permits a district court to infer secondary meaning. *E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 200 (3d Cir. 2008). For product configuration cases, the Court looks at the plaintiff's "advertising expenditures, measured primarily with regard to those advertisements which *highlight the supposedly distinctive identifying feature* . . . ." *Duraco*, 40 F.3d at 1452 (emphasis added). The advertising should "*direct* the consumer to those features claimed as trade dress." *Buzz Bees Toys*, 20 F. Supp. 3d at 500 (emphasis added) (quoting *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 44 (1st Cir. 2001)).

The evidence Novartis presented does not indicate that it ran a "prevalent advertising campaign" that "directed" consumers to the claimed trade dresses. *Astrazeneca AB v. Dr. Reddy's Laboratories, Inc.*, is instructive. 145 F. Supp. 3d 311 314 (D. Del. 2015). There, Astrazeneca "prominently" featured its distinctive color purple and invested over $250 million per year in promoting its purple brand. *Id.* Astrazeneca advertised both its Prilosec product as "the only purple pill that treats heartburn due to acid-reflux disease" and its Nexium product on a

17

"predominantly purple website that prominently displays Nexium capsules and AZ's trademark 'The Purple Pill.'" *Id.* Using the same distinctive color across multiple products helps consumers associate the trade dress with the brand, as opposed to just the product.

In *Duraco*, the Third Circuit explained that although "secondary meaning in a product configuration case will generally not be easy to establish," it may be easier "with respect to drugs or pills with unusual colors and/or shapes [where] a consumer may be more likely to rely on the product's configuration as a source designator." 40 F.3d at 1453. The parties here do not argue that off white, pale yellow, and light pink are "unusual" colors for drugs. Instead, MSN points to several other drugs that use similar colors, including other heart failure medications. *See, e.g.*, PI Opp'n at 17 ("[T]here are many off-white, yellow, and pink pills on the market, including heart medications.") (citing Carrero Decl. Ex. 1). Even Novartis acknowledges that some other heart medications share the same colors as Entresto. PI Mot. at 18.

Christian Louboutin shoes serve as another illustrative example. The lacquered red outsole gained secondary meaning when it became "'uniquely' associated with the Louboutin brand." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Hldgs., Inc.*, 696 F.3d 206, 226-27 (2d Cir. 2012) (quoting *Qualitex*, 514 U.S. at 162). There, Louboutin invested in promoting its red outsole as "its signature in women's high fashion footwear" and the red outsole came to "'identify and distinguish' the Louboutin brand." *Id.* (quoting *Qualitex*, 514 U.S. at 163). There too, the red outsole became associated with the brand generally and not just with a specific product.

In contrast here, the evidence does not show that the trade dresses of Entresto have come to be understood as symbols of the Novartis brand. Although Novartis may have hoped to acquire secondary meaning, Novartis has not shown it achieved that goal. *See Cococare Prods.*, 538 F.3d at 199 (finding no evidence that plaintiff acquired secondary meaning despite using the mark "on

many occasions over a long period of time"). While Novartis invested about $2.1 million total in developing webpages and resources and over $200,000 printing resources for distribution to healthcare providers, Miller Decl. ¶ 44, those materials do not draw specific attention to the appearance of Entresto for consumers in a way that associates it with Novartis.

Novartis claims that it highlighted the Entresto trade dress in its advertisements, but Novartis's advertisements merely include the trade dresses alongside information that identifies what the product does, how often to take it, and what dosages are available. The advertisements do not appear to create an association between the small ovaloid violet white, pale yellow, and light pink tablets and Novartis. A few representative examples of Novartis's advertisements are included below:



Miller Decl. ¶ 37.



Miller Decl. ¶ 43.

Nor do Novartis's success in sales remedy this shortcoming. Top sales can support secondary meaning when sales increase alongside marketing. *Cococare Prods.*, 538 F.3d at 199-200. However, in the product configuration context, sales success may not be as probative. "In this respect product configuration again differs dramatically from trademark and product packaging, since the success of a particular product . . . does not readily lead to an inference of source identification and consumer interest in the source." *McNeil Nutritionals, LLC v. Heartland Sweeteners LLC*, 566 F. Supp. 2d 378, 391 (E.D. Pa. 2008) (quoting *Duraco*, 40 F.3d at 1252-53). Moreover, Novartis's expert concedes that Entresto's "lifechanging capabilities" drove its successful sales and lasting impression. Miller Decl. ¶ 30. Considering this evidence, the Court cannot infer that the appearance of Entresto has left a lasting impression in the minds of consumers connecting it to Novartis as a source or that advertising the mark drove Novartis's sales. *See Cococare Prods.*, 538 F.3d at 199 (finding that the record lacked evidence showing "what lasting impression the advertising [of the mark] left in the mind of consumers or what portion of Browne's revenue growth it caused").

In short, it is not clear that Novartis's advertisements and sales draw an association between the Entresto trade dresses and Novartis. Secondary meaning requires that the consuming public come to associate the appearance of the drug with the manufacturer. *Inwood Lab'ys*, 456 U.S. at 851 n.11 ("To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the *source* of the product rather than the product itself." (emphasis added)). The evidence here does not identify an advertising campaign so "prevalent" that it justifies inferring secondary meaning. Nor did Novartis demonstrate that the sales of Entresto were motivated in any part by consumer association of the trade dresses with Novartis. The Court therefore finds that the first factor weighs in favor of MSN.

   *b.*  *Length and exclusivity of use*

For about ten years, Novartis has exclusively sold pills featuring the trade dresses of Entresto in the heart failure medication market. D.E. 4-5 ("Ward Decl.") ¶ 8. *Duraco* raised the specter of "seriously transgressing the protective zones mapped by the patent laws" in finding that trade dress protects a product configuration when there has been no showing of secondary meaning. 40 F.3d at 1450-51. The Third Circuit there explained that "*any* perceptible product feature or combination or arrangement of features *can* distinguish goods, and perhaps is likely to do so if, as a rule, nobody else were allowed to copy it." *Id.* at 1447; *see also id.* at 1450 n.12 ("In the design protection area, our construction of the Lanham Act is informed to some degree by the concurrent existence of the patent laws.") (citing *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 879 (1994)).

The Court is therefore wary of giving this factor too much weight here. Accordingly, this factor weighs in Novartis's favor, but not strongly. *See Buzz Bees Toys*, 20 F. Supp. 3d at 501

("five years, not so long a time as to raise a strong inference of consumer association with a single source" for product configuration trade dress (quoting *Duraco*, 40 F.3d at 1454)); *cf. McNeil Nutritionals, LLC v. Heartland Sweeteners LLC*, 566 F. Supp. 2d at 392 (finding that six years of exclusive use supported secondary meaning for a product labeling trade dress case, which "differs dramatically from trademark and product packaging") (quoting *Duraco*, 40 F.3d at 1452-53).

### c.    Copying

In the context of product configurations, attempts to copy "will quite often not be probative: the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product." *Buzz Bees Toys*, 20 F. Supp at 502 (quoting *Duraco*, 40 F.3d at 1453) (internal quotations omitted). Here, MSN states that it has mirrored the appearance of Entresto to provide its consumers with the functional benefits described above, *supra* section V.A.1. Novartis has submitted no evidence to the contrary. Without any indication that MSN is attempting to confuse consumers or pass off its tablets as Novartis's, MSN's copying is not probative of secondary meaning. Therefore, this factor weighs in favor of MSN or is neutral.

### d.    Customer surveys and testimony

Novartis provides no direct evidence demonstrating that consumers have come to associate the colors, size, and shape of Entresto with Novartis. While Novartis's expert states that she was "able to recognize Entresto just by seeing the pills," Nayeri Decl. ¶ 20, this evidence is not enough. As an initial matter, a single declaration does not show that the Entresto trade dresses achieved secondary meaning in the minds of the consuming public. 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:45 (5th ed.). But more importantly, the declaration does not show that Novartis's expert specifically associated the Entresto trade dresses with *Novartis itself*. Novartis offers no other evidence of customer surveys or testimony.

22

Although, customer surveys and testimony are not required to demonstrate secondary meaning *Cococare Prods.*, 538 F.3d at 201, their absence is significant here where Novartis offers little to support its arguments that the consuming public has come to associate the mere appearance of Entresto tablets with Novartis.

> e.    *Use of trade dress in trade journals and media*

Extensive use of a trade dress in trade journals and media can support a finding of secondary meaning. *Tyson Foods*, 863 F.3d at 231. The publications that Novartis points to, however, suffer from a similar infirmity as Novartis's advertisements. The issue here is the color, size, and shape of Entresto and the association of those features collectively with *Novartis as a brand*. Some of the publications that Novartis relies upon do not even include images of Entresto or if they do, include images of only one dosage strength.[13] *See, e.g.*, PI Mot. at 22 (citing D.Es. 4-21, 4-22, 4-36). This does not help Novartis. *Truinject Corp. v. Galderma S.A.*, 694 F. Supp. 3d 491, 508-09 (D. Del. 2023) (finding insufficient evidence of trade dress in part because "only a fraction of the Instagram posts and journal articles actually included the trade dress"). While some of the other exhibits do include an image of all three dosage strengths, D.Es. 4-23, 4-26, 4-30, these few publications do not persuade the Court that the consuming public has come to associate small oval violet white, pale yellow, and light pink tablets with Novartis as a brand. This factor weighs in favor of MSN.

---

[13] Novartis does not explain how an image of the Target Dose (light pink tablet) causes a consumer to associate the other color (violet white and pale yellow) tablets with Novartis. Nor does Novartis explain how the features of the Entresto trade dress, i.e., color, shape, and size, come to signify Novartis based upon images that do not reliably indicate size.

f.    *Company size and number of sales*

Novartis is a well-known global company within the pharmaceutical industry with net sales exceeding $45.4 billion.  Miller Decl. ¶ 6.  Entresto is the top-selling heart failure medication and is responsible for over $10.5 billion in sales to approximately over 2.5 million patients.  Miller Decl. ¶¶ 20, 25-26.  There is no doubt that Novartis as a company and Entresto as a product are highly successful.  These factors weigh in favor of Novartis.

g.    *Weighing the secondary meaning factors*

The secondary meaning factors present a complex case here.  Novartis asks this Court to conclude that consumers have come to associate the appearance of Entresto—small ovaloid violet white, pale yellow, and light pink tablets—with Novartis.  There is evidence that the consuming public has come to associate the overall appearance of the drug products with the *drug product's ingredients and/or effects*, but that answers a question distinct from whether the consuming public has come to associate the tablets' overall appearance with *Novartis as the source*.  On the one hand, Entresto is a highly successful product, it has been the only heart medication with its particular appearance for the past decade, and Novartis is a well-known company in the pharmaceutical industry.  On the other hand, Novartis has provided no direct evidence of consumer association, media publications feature the appearance of Entresto only a fraction of the time, and Novartis has not emphasized the size, shape, and color of Entresto in its advertisements or linked those features to Novartis itself.[14]  On these facts—and considering the Supreme Court's and Third Circuit's warnings against overextending trade dress protection—the Court finds it difficult to infer that like the "Purple Pill" for Astrazeneca and the red outsoles for Christian Louboutin shoes, small oval

---

[14] The advertisements that Novartis submitted as exhibits do not appear to even mention Novartis. *See supra* section V.A.2.a.

off-white and pastel tablets have achieved secondary meaning in the minds of the consuming public.

### 3. Likelihood of Confusion

To obtain trade dress protection, Novartis must also show a likelihood of confusion. To satisfy this element of trade dress infringement, Novartis must show "that an appreciable number of ordinarily prudent consumers of the type of product in question are likely to be confused as to the source of the goods." *Versa*, 50 F.3d at 200. "The mere possibility that a consumer might be mislead is not enough." *Id.* (quoting *Surgical Supply Serv., Inc. v. Adler*, 321 F.2d 536, 539 (3d Cir. 1963)). Typically, courts in the Third Circuit review the following factors to analyze likelihood of confusion:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, [even if not] competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is unlikely to expand into that market.

*Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983) ("*Lapp* factors").

Product configuration cases are subject to a somewhat different approach here too. In *Versa*, the Third Circuit reasoned that because "product configurations are not reliable as source indicators" and because "substantially identical products are often sold by different manufacturers under different names, consumers are accustomed to relying on product packaging and trademarks to identify product sources." *Versa*, 50 F.3d at 201. As a result, consumers tend to "look to the packaging, trademarks, and advertising used to market the product" as an indicator of the product's

source. *Id.* at 202-03. Therefore, in product configuration cases, although courts should assess all *Lapp* factors, they should give most weight to the product's labeling,[15] packaging, and advertisements in assessing likelihood of confusion. *Id.*

The Third Circuit's reasoning in *Versa* applies in equal force to the prescription drug context. *First*, as explained above, this is a product configuration trade dress case, *see supra* section V.A.2. *Second*, the prescription drug industry is also one where substantially similar drug products are often sold by different manufacturers. *See Versa*, 50 F.3d at 201, 203; *see also* Nithiyandam Decl. ¶ 12; Clark Decl. ¶¶ 83-84, D.E. 13-23. *Third*, consumers exercise increased care, and this industry is one where the ultimate patient is "not necessarily involved in the decision to select one drug over another." *Astrazeneca*, 145 F. Supp. 3d at 317; *see also* D.E. 13-49 ("Ardehali Decl.") ¶¶ 27, 35-39; Shimer ¶ 48. Accordingly, although the Court analyzes all relevant *Lapp* factors, it assigns most weight to differences in advertising, packaging, and labeling.

### a.    Degree of similarity

As this Court found before, MSN's tablets look "strikingly similar" to Entresto. PI Opinion at 13. Trademark cases are typically "open and shut" when a defendant competitor uses an identical mark. *Opticians Ass'n of Am. v. Ind. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) (quoting 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 23:7 (2d ed. 1984)). But because appearance tends not to be a reliable source indicator, "a finding of substantial similarity of trade dress in a product configuration does not by itself strongly suggest a likelihood of confusion." *Versa*, 50 F.3d at 201-02. This factor therefore weighs in favor of Novartis but not significantly.

---

[15] The Third Circuit refers to the "container, package, wrapper, or label of the manufacturer's or trader's name" here. *Versa*, 50 F.3d at 203. The Third Circuit was not referring to a drug's Highlights of Prescribing Information, which is commonly referred to as a drug's "label."

### b.    Strength of the owner's mark

In a product configuration case, evidence must indicate "actual *reliance* by consumers on a particular product configuration as a source indicator before crediting that configuration's 'strength' toward likelihood of confusion." *Versa*, 50 F.3d at 203; *see also Wal-Mart*, 529 U.S. at 213 ("In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist."). Here, there is no evidence that healthcare providers or patients rely on size, shape, and color to identify the manufacturing source of the tablets or that product appearance plays a role in consumers' selection processes. *See Versa*, 50 F.3d at 204. At most, there is evidence that a healthcare provider was able to identify Entresto by simply seeing the tablets but that does not suffice. *See supra* section V.A.2.d. Therefore, this factor weighs in favor of MSN.

### c.    Consumer care in purchase

### i.    Exercise of care

In the product configuration context, "one expects a consumer exercising ordinary care to ascertain the source of a product to rely much more on packaging, trademarks, and adverting, which if not deceptive tend to reveal the product's source unambiguously, than on the product configuration . . . ." *Versa*, 50 F.3d at 204 (finding that reliance on a product's configuration as a source identifier would be rare). The parties here do not discuss the packaging of the drug products. However, the exhibits Novartis submitted demonstrate that drug containers are clearly labeled with the Entresto trademark. *See, e.g.*, D.E. 4-30. And Novartis does not argue that MSN's proposed packaging is deceptive. Without any evidence that consumers would be confused about the drug product's source based upon its packaging, this tips in favor of MSN.

With respect to trademarks, this Court previously found that there was no likelihood of confusion between the trademarks Novartis and Novadoz.  PI Opinion at 18-21.  Accordingly, the Court finds that this tips in favor of MSN too.  Finally, the Court notes that while the record does not identify any MSN advertisements, Novartis's own advertisements do consistently use the Entresto trademark as well.  Novartis's use of Entresto in its advertisements tips in favor of MSN too.

## ii.    Consumer care

The Third Circuit has directed courts to heavily weigh a consumer's degree of care in product configuration cases.  *See Versa*, 50 F.3d at 204 ("We believe that this factor takes on enhanced importance when a claim is made for infringement of trade dress in a product configuration [case].").  The Court also notes that healthcare providers are sophisticated and familiar with the drug industry.  *Checkpoint Sys.*, 269 F.3d at 286.  To the extent that patients should be considered, they tend to exercise a greater degree of care when it comes to costly medical products, even though they are not as sophisticated as healthcare providers.  *See McNeil Nutritionals*, 511 F.3d at 365.  And the more sophisticated consumers are and the greater the care they exhibit, the less the likelihood of confusion.  *Checkpoint Sys.*, 269 F.3d at 284 (citing *Versa*, 50 F.3d at 204).

The Third Circuit has cautioned courts against placing too much weight on the consumer care in the context of pharmaceuticals.  *See Kos Pharms.*, 369 F.3d at 716 (collecting cases justifying a stricter standard in the medical context to prevent a likelihood of confusion).  The Third Circuit's admonition, however, came in the context of a trademark case where two drugs treated the same conditions and had similar sounding names, but had different active ingredients.  *Kos Pharms.*, 369 F.3d at 716-17.  Here, however, Novartis's drug and MSN's drug would have

the same active ingredients, would be bioequivalent, and healthcare providers would not rely on the disputed trade dress to issue prescriptions.  Nithiyanadam Decl. ¶¶ 3-5; Ardehali Decl. ¶¶ 29-30.  Therefore, this factor slightly weighs in MSN's favor or is neutral.

d.    <em>Actual confusion and lack thereof</em>

Because MSN's generic is not yet on the market, the fourth and sixth *Lapp* factors, which relate to actual confusion, cannot be analyzed.  These factors therefore favor neither party.

e.    <em>Intent to infringe</em>

"Evidence of intentional, willful and admitted adoption of a mark closely similar to the existing mark weighs strongly in favor of finding a likelihood of confusion."  *Kos Pharms.*, 369 F.3d at 721 (quoting *Checkpoint*, 269 F.3d at 286) (internal quotations omitted).  However, copying does not alone establish secondary meaning, *American Beverage Corp. v. Diageo North America, Inc.*, 936 F. Supp. 2d 555, 602 (W.D. Pa. 2013), and in product configuration cases, is often not probative, *Duraco*, 40 F.3d at 1453.  Here, MSN submits evidence demonstrating that it sought to mimic the trade dress of Entresto for functional reasons.  Clark Decl. ¶ 53; Nithiyandam Decl. ¶¶ 8, 13-14; Shimer Decl. ¶¶ 27-47.  Novartis submits no evidence that MSN intends to pass off its generic tablets as Novartis's.  Therefore, this factor is neutral or weighs in MSN's favor.

f.    <em>Factors 7-10</em>

Although MSN seeks to enter the market as a generic, it will compete for the same consumers as Novartis.  *Astrazeneca AB*, 145 F. Supp. at 318.  Therefore, these factors weigh in favor of Novartis too.

g.    <em>Weighing the Lapp factors</em>

The Court finds that there is not a likelihood of confusion here between Novartis and MSN based upon the trade dresses here.  In the ordinary trademark case, substantial similarity and

29

competition in the same market would suffice.  This is not such a case.  As best as the Court can discern, the advertisements and packaging surrounding Novartis's product—which consumers are more likely to look to for source identification—clearly label it as Entresto.  Novartis's trade dress is weak, and it has not shown that MSN mimicked Entresto to cause confusion.  And generics regularly mimic the product configurations of branded counterparts.  *See supra* section V.A.1.b. In this context, the factors in MSN's favor outweigh the tablets' similarity and participation in the same market, or at least make likelihood of confusion a close call.

Having concluded that the size, color, and shape of Entresto are functional, have not acquired secondary meaning, and are not subject to a likelihood of confusion, the Court finds that Novartis is not likely to succeed on the merits of its trade dress infringement claim.

## B.    Irreparable Harm[16]

A preliminary injunction should not issue "unless the moving party shows that it specifically and personally risks irreparable harm."  *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009).  Injuries fully compensable by monetary damages are not irreparable.  *Id.*  "[L]oss of control of reputation, loss of trade, and loss of will," however, cannot be redressed solely by monetary damages and may therefore justify injunctive relief as a remedy. *Kos Pharm.*, 369 F.3d at 726.

In a trademark infringement case, when a plaintiff demonstrates a likelihood of success on the merits, the plaintiff is entitled to a rebuttal presumption of irreparable harm.  *Nichino*, 44 F.4th at 184-85.  However, when the plaintiff has failed to show a likelihood of success on the merits,

---

[16] The Court need not reach the other preliminary injunction factors because "[a] plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate."  *Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 185-86 (3d Cir. 2022) (quoting *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)).  However, for the sake of completeness, the Court will address the remaining prongs required for a preliminary injunction.

the presumption does not apply, and plaintiff must independently show it "specifically and personally risks irreparable harm." *Liberty Lincoln-Mercury*, 562 F.3d at 557; *see also Nichino*, 44 F.4th at 184 (affirming the district court's denial of a preliminary injunction because "Valent rebutted the presumption, and Nichino did not independently show irreparable harm"). Because Novartis has not shown a likelihood of success on its trade dress infringement claim, the Court addresses the merits of Novartis's irreparable harm theories without applying the presumption outlined in *Nichino*.

Novartis's concerns are predominantly grounded in its fear that MSN's generic may turn out to be defective and may thereby harm Novartis's reputation. PI Mot. at 37-38. *First*, Novartis worries that because MSN's drug label omits certain dosing information, Novartis's reputation will bear the blame when healthcare providers prescribe the wrong dose of Entresto after consulting MSN's drug label after being led astray by images of MSN's generic. As an initial matter, Novartis's expert declarations do not contend that this hypothetical chain of events is likely to occur—they contend only that it *could*. *See* Ward Decl. ¶ 20 (certain patients *could* receive a higher dose than is directed by the Entresto label") (emphasis added), ¶ 21 ("A patient . . . *could* believe the MSN Generic is Entresto . . . .") (emphasis added); Nayeri Decl. ¶ 29 ("An HCP *could* inadvertently mix up two drugs based on their appearance . . . . Exposure to that information *could* lead HCPs to consult the generic's FDA-approved label and packaging insert . . . . HCP confusion—and the inadvertent reference to the generic's prescribing information, rather than Entresto's prescribing information—*could* lead to patient harm. A confused HCP *might* fail to prescribe a reduced dosing regimen . . . .") (emphases added); *cf.* Ardehali Decl. ¶¶ 29-30 (disagreeing that "the appearance of tablets for an approved generic version of Entresto would

31

result in any kind of confusion or medical error among doctors based on the physical attributes of the drugs").

Moreover, the FDA and another court have already rejected Novartis's safety concerns based on MSN's proposed label. *Novartis Pharms. Corp. v. Becerra*, No. 24-2234, 2024 WL 3823270, at *6 (D.D.C. Aug. 13, 2024) (crediting the FDA's "unambiguous" judgment that the dosing information omitted from MSN's label "would *not* render [MSN's] drugs less safe or effective" and finding that Novartis's theory of harm requires "irrational[l]" behavior); *see also United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360, 1369 (Fed. Cir. 2023) (collecting cases declining to disturb the FDA's judgment on questions of safety and efficacy).

*Second*, Novartis fears that MSN's generic may face contamination issues because it will be manufactured in countries where other drugs have faced quality control problems. Nayeri Rebuttal Decl. ¶ 10. But Novartis must show it specifically and personally risks irreparable harm. *Liberty Lincoln-Mercury*, 562 F.3d at 557. It does not suffice here for Novartis to argue that harm *may* befall MSN and that consumers *may* blame Novartis for it.

*Third*, Novartis fears that illegal substitution may occur or that confused patients will accidentally request refills of MSN's generic instead of refills of Entresto. PI Mot. at 38. But again, Novartis provides no evidence that illegal substitution is likely to occur. *See Shire*, 329 F.3d at 35-56 (distinguishing trademark cases relating to prescription drugs in part because "there was evidence of the passing off of the defendant's product"). Moreover, patients are notified when their drugs are swapped for a generic. *See, e.g.*, *Becerra*, 2024 WL 3223270, at *7. The Court therefore does not credit these theories of irreparable harm either.

*Finally*, Novartis's remaining fears of lost sales are economic in nature and compensable by damages. Indeed, courts in this district and others regularly find that lost sales are compensable.

*See, e.g.*, *Otsuka Pharm. Co., Ltd. v. Torrent Pharms., Ltd., Inc.*, 99 F. Supp. 3d 461, 501 (D.N.J. 2015) (collecting cases). Accordingly, Novartis's injuries, as articulated, do not warrant the extraordinary remedy of injunctive relief.

### C.    Balance of Harms

The third prong of the preliminary injunction analysis requires the Court to "balance the relative harm to the parties, *i.e.*, the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002). Here, MSN would lose its first-mover advantage, potentially to Noratech, if MSN is barred from entering the market. D.E. 13-2 at ¶¶ 30-32. Such injury would impose significant hardship on MSN.

Novartis claims it will lose goodwill, but those injuries are speculative. But even if the Court credited Novartis's theories of reputational harm, its harm would be outweighed by the harm to MSN. *See In re Entresto (Sacubitril/Valsartan) Patent Litig.*, No. 20-md-2930, 2024 WL 3757086, at *5 (D. Del. Aug. 12, 2024). Therefore, the balance of harms favors MSN.

### D.    Public Interest

Novartis's exclusivity over Entresto may not continue indefinitely. While protection of its trade dress would nevertheless permit generic counterparts to enter the market using different colors and/or shapes, those differences would come at the expense of patient's expected visual continuity and would impact patient adherence. The Lanham Act encourages competition. *See Shire*, 329 F.3d at 353. It is not a backstop to loss of exclusivity or a tool to extend and entrench market dominance after a patent's expiration. *See Versa*, 50 F.3d at 204 ("The penumbra of the federal patent laws restricts the degree to which courts may grant legal recognition of consumer reliance on product configurations as source indicators . . . ."). There is little question here that

denial of injunctive relief and the availability of a generic alternative to a life-saving medication is in the public interest.

## VI.    CONCLUSION

Having determined that none of the preliminary injunction factors favor Novartis, the Court will **DENY** Novartis's Motion for a Preliminary Injunction and will **DENY** Novartis's Motion for an Injunction Pending Appeal.  An appropriate Order accompanies this Opinion.

Dated: July 15, 2025

Evelyn Padin, U.S.D.J.

# EXHIBIT B

**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| NOVARTIS AG and NOVARTIS PHARMACEUTICALS CORP., <br><br>     Plaintiffs, <br><br>     v. <br><br> NOVADOZ PHARMACEUTICALS LLC *et al.*, <br><br>     Defendants. | No. 25cv849 (EP) (JRA) <br><br> **ORDER** |

Plaintiffs Novartis AG and Novartis Pharmaceuticals Corporation move for a preliminary injunction against Defendants MSN Laboratories Private Limited, MSN Pharmaceuticals Inc., and Novadoz Pharmaceuticals LLC for alleged infringement of Plaintiffs' trademark and trade dress rights. D.E. 4. Novartis also moves for an injunction pending appeal. D.E. 54. Having *sua sponte* reconsidered the parties' submissions and all other relevant items on the docket, and having determined that oral argument is not necessary,

**IT IS**, on this **15th** day of July 2025, for the reasons set forth in the accompanying Opinion,

**ORDERED** that Plaintiffs' Motion for a Preliminary Injunction, D.E. 4, is **DENIED**; and it if further

**ORDERED** that Plaintiffs' Motion for an Injunction Pending Appeal, D.E. 54, is **DENIED**.

Evelyn Padin, U.S.D.J.

# EXHIBIT C

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NOVARTIS AG and NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>    Plaintiffs,<br><br>v.<br><br>NOVADOZ PHARMACEUTICALS LLC, *et al.*,<br><br>    Defendants. | No. 25cv849 (EP) (JRA)<br><br>**OPINION** |

**PADIN, District Judge.**

This Court granted Plaintiffs Novartis AG and Novartis Pharmaceuticals Corporation's (together, "Novartis") motion for a preliminary injunction, D.E. 4 ("PI Motion" or "PI Mot."), against Defendants MSN Laboratories Private Limited, MSN Pharmaceuticals Inc., and Novadoz Pharmaceuticals LLC (collectively, "MSN") for alleged infringement of Novartis's trademark and trade dress rights. D.E. 32 ("Opinion"). Defendants have appealed that decision to the Third Circuit, D.E. 35, and move to stay the preliminary injunction pending that appeal. D.E. 37 ("Stay Motion" or "Stay Mot.").

The Court understands the imperative nature of the matter before it. After careful consideration of the arguments before it and the circumstances the parties face pending appeal before the Third Circuit, the Court will **GRANT** the Stay Motion.

## I.    BACKGROUND

Novartis is a pharmaceutical company that manufactures ENTRESTO®, an FDA-approved heart failure prescription medication that was launched in 2015. D.E. 1 ("Compl.") ¶¶ 3, 52-53. It is the number one heart failure brand prescribed by physicians and has helped reduce the risk of

death and hospitalization for over 2.5 million patients. *Id.* ¶ 3. Novartis's generics partner is Sandoz, which used to be Novartis's wholly-owned generics division prior to its sale. *Id.* ¶ 7.

ENTRESTO® is offered in three doses, each in a unique combination of size, shape, and color. *Id.* ¶ 59. The Low Starting Dose, a 24/26 mg dose, is a violet white oval tablet, measuring 13.1 mm x 5.2 mm; the Recommended Starting Dose, a 49/51 mg dose, is a pale yellow oval tablet, measuring 13.1 mm x 5.2 mm; and the Target Dose, a 97/103 mg dose, is a light pink oval tablet, measuring 15.1 mm x 6.0 mm. *Id.* Images of the drug show that the face of each pill is marked "NVR." D.E. 4-4 ("Valazza Decl.") ¶ 15.

Novartis alleges that MSN will imminently bring to market a generic version of ENTRESTO®, under the NOVADOZ name, intending to confuse healthcare providers and consumers into believing NOVADOZ is affiliated with Novartis (the "MSN Drug"). Compl. ¶¶ 6-7. Novartis avers that the physical similarities between NOVADOZ and ENTRESTO®, as well as NOVADOZ's name—purportedly intended to invoke a combination of Novartis and Sandoz— reflect an intentional effort to deceive the marketplace. *Id.* ¶ 7. The launch of NOVADOZ, however, hinges on proceedings before the Federal Circuit. *Id.* ¶ 89. Patent barriers also currently prevent NOVADOZ and other generics from launching before July 16, 2025. D.E. 49.

MSN submitted an Abbreviated New Drug Application ("ANDA") for its generic equivalent to ENTRESTO® on July 7, 2019. D.E. 13-7 ("Nithiyanandam Decl.") ¶ 3. For an ANDA to receive FDA approval, the generic drug product must contain the same active ingredient(s) of the branded drug, come in the same dosage form, and deliver the same dose. *Id.* ¶ 4. As a result, the MSN Drug also comes in three tablets: a 24/26 mg tablet, 49/51 mg tablet, and a 97/103 mg tablet. *Id.* ¶ 5. MSN's 2019 ANDA contained proposed dimensions of the drug products, respectively measuring 10 x 4 mm, 13 x 5.10 mm, and 15 x 5.9 mm. *Id.* ¶ 6. Images of

**NOT FOR PUBLICATION**

the MSN Drug show that the face of each pill is marked "M." *Id.* The pills are not identical, but they are similar.

| PARAMETERS | REFERENCE LISTED DRUG | PROPOSED DRUG PRODUCT |
|---|---|---|
| Strengths | 24 mg/ 26 mg, 49 mg / 51 mg and 97 mg/ 103 mg | 24 mg/ 26 mg, 49 mg / 51 mg and 97 mg/ 103 mg |
| Configuration | | |
| 24 mg/ 26 mg, 49 mg / 51 mg and 97 mg/ 103 mg | Bottle of 60's and 180's | Bottle of 60's and 180's |
| 24 mg/ 26 mg |  |  |
| 49 mg/ 51 mg |  |  |
| 97 mg/ 103 mg |  |  |
| Dimensions | | |
| 24 mg/ 26 mg | 13.35 x 5.33 | 10.00 X 4.00 mm |
| 49 mg/ 51 mg | 13.25 x 5.30 | 13.00 X 5.10 mm |
| 97 mg/ 103 mg | 15.34 x 6.12 | 15.00 X 5.90 mm |
| Active Ingredient | Sacubitril and Valsartan | Sacubitril and Valsartan |

*Id.*

Novartis brings claims for trademark infringement, false designation of origin, trade dress infringement, and unfair competition. *Id.* ¶¶ 128-205. It argues that patients will face imminent health risks as the MSN Drug does not have identical FDA-approved dosing instructions and will be confused with ENTRESTO®. PI Mot. at 3. Specifically, the ENTRESTO® label and prescribing information directs certain patients to start with a low starting dose, while the MSN Drug label and prescribing information does not. *Id.* at 14-15. Novartis argues it will face reputational damage and loss of trade in the form of lost sales. *Id.* at 37.

## II.  PROCEDURAL HISTORY

Novartis's motion for a preliminary injunction also sought a temporary restraining order. PI Mot. This Court denied Novartis's request for temporary restraints but ordered expedited briefing on the preliminary injunction motion. D.E. 7. MSN's opposition, D.E. 13 ("PI Opp'n"),

**NOT FOR PUBLICATION**

and Novartis's reply, D.E. 17 ("PI Reply"), followed.  The Court then issued the Opinion.  Shortly thereafter, MSN moved to stay.  Stay Mot.  Novartis opposed, D.E. 42 ("Stay Opp'n"), and MSN replied, D.E. 44 ("Stay Reply").[1]

## III.    LEGAL STANDARD

As the standard for a stay or an injunction pending appeal "is essentially the same as that for obtaining a preliminary injunction," the Court considers the preliminary injunction factors in determining whether to grant the Stay Motion.  *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health and Human Servs.*, No. 13-1144, 2013 WL 1277419, at *1 (3d Cir. 2013).  Novartis was required to demonstrate:

> (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.

*Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708. (3d Cir. 2004).  "[W]hen evaluating whether interim equitable relief is appropriate, '[t]he first two factors of the traditional standard are the most critical.'"  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (quoting *Nken v. Holder*, 556 U.S. 418, 424 (2009)).  But "'[a] plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate.'"  *Conestoga*, 2013 WL 1277419, at *1 (quoting *NutraSweet Co. v. Vit-Mar Enter., Inc.*, 176. F.3d 151, 153 (3d Cir. 1999)).

## IV.    ANALYSIS

The Court first addresses functionality before turning to MSN's primary argument that the Court did not implement the proper burden-shifting framework to prove irreparable harm in

---

[1] The Court also indicated it was considering *sua sponte* reconsidering its Opinion and provided the parties an opportunity to brief the issue.  D.E. 43.  The parties did so.  D.E.s 45-46.  The Court addresses the Stay Motion and does not *sua sponte* reconsider its Opinion because "[a]s a general rule, the timely filing of a notice of appeal . . . divest[s] a district court of its control over those aspects of the case involved in the appeal."  *Venen v. Sweet*, 758 F.2d 117, 120 (3d Cir. 1985).

trademark cases. Stay Mot. at 8. Novartis agrees that the Court applied the wrong framework for irreparable harm. Stay Opp'n at 11. The Court also agrees. The Court then addresses whether Novartis will suffer irreparable harm if the Court's preliminary injunction is not maintained for the time being. The Court finds that Novartis will not suffer irreparable harm if the Court stays its preliminary injunction for the pendency of MSN's appeal. As explained below, the parties' helpful reflection of the record in briefing the Stay Motion, the application of the appropriate legal framework, and attention to the parties' posture on appeal here in the Third Circuit and before the Federal Circuit merit staying this Court's preliminary injunction pending MSN's appeal. Therefore, the Court will grant the Stay Motion.

**A. Likelihood of Success on the Merits**

"A plaintiff must prove three elements to establish trade dress infringement under the Lanham Act: '(1) the allegedly infringing design is nonfunctional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product.'" *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309 (3d Cir. 2014) (quoting *McNeil Nutritionals, LLC v. Heartland Sweeteners*, LLC, 511 F.3d 350, 357 (3d Cir. 2007)). This Court is also mindful of the Third Circuit's instruction that courts should "caution against the over-extension of trade dress protection." *Shire US Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 358 (2003). Trade dress protection should extend "only to incidental, arbitrary or ornamental product features which identify the product's source." *Shire*, 329 F.3d at 353. Upon close consideration of the parties' arguments, the Court finds that the allegedly infringed design is functional[2] and that Novartis is therefore

_____

[2] The Court recognizes that its holding here is in conflict with its previous holding. Opinion at 6-10. The Court appreciates the parties' close attention to the issues in briefing the Stay Motion and notes that courts sometimes get things wrong. *See, e.g.*, *Thompson Reuters Enter. Ctr. GmbH v.*

unlikely to succeed on the merits of its trade dress infringement claim on appeal.  The Court also finds that in any event, Novartis is unlikely to suffer irreparable harm in the absence of injunctive relief during the pendency of the appeal.

          *1.    Non-functionality*

MSN argues that it is likely to succeed on the merits of its appeal because the Court erred in finding non-functionality.  Stay Mot. at 17-21.  The Court agrees.

"Trade dress, a subset of trademark, protects distinctive choices (like size, shape, and color) that make up 'the overall look of a product.'"  *PIM Brands Inc. v. Haribo of Am. Inc.*, 81 F.4th 317, 321 (3d Cir. 2023) (quoting *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 255 (3d Cir. 2021)).  To be functional, the trade dress as a whole "need only be useful, not essential." *Ezaki Glico*, 986 F.3d at 258.  And [t]he question is not whether the product or feature is useful, but whether 'the particular shape and form' chosen for that feature is." *Id.* at 257 (quoting 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7:70 (5th ed. 2020)).

"A nonfunctional feature is one that 'is unrelated to the consumer demand . . . and serves merely to identify the source of the product or business.'" *EBIN New York, Inc. v. Kiss Nail Prods., Inc.*, No. 23-2369, 2024 WL 1328029, at *6 (D.N.J. Mar. 28, 2024) (quoting *Fair Wind*, 764 F.3d at 311).  "Conversely, a functional feature is 'one that is essential to the use or purpose of the article, affects the cost or quality of the article, or one that, if kept from competitors, would put them at a significant non-reputation-related disadvantage.'" *Id.* (quoting *Fair Wind*, 764 F.3d at 310).  The Court evaluates the color, size, and shape of ENTRESTO® and finds that all aspects are functional.

---

*Ross Intel. Inc.*, No. 20-cv-613-SB, 2025 WL 458520, at *1 (D. Del. Feb. 11, 2025) ("A smart man knows when he is right; a wise man knows when he is wrong. Wisdom does not always find me, so I try to embrace it when it does—even if it comes late, as it did here.").

**NOT FOR PUBLICATION**

a.  Color-Coding and Size

MSN argues that communication of functional information to patients—what drug each pill is and what dose it contains—is evidenced by the colors and sizes of the ENTRESTO® pills. PI Opp'n at 13.  It further indicates that consistent color-coding systems can reduce therapeutic errors in other drug regimens.  D.E. 13-40 ("Clark Decl.") ¶ 53.  On the other hand, Novartis attests that it is unaware of "any functional reason why the Low Starting Dose and the Recommended Starting Dose need to be smaller than the Target Dose.  These sizes could be made uniform without impacting the efficacy of the formulation."  Valazza Decl. ¶ 20.  According to Novartis, the selection of size and shape of the pills, therefore, was purely based on a desire to differentiate the tablets from competitors' trade dresses.  *Id.* ¶ 16.  And while ENTRESTO® comes in three doses, patients can progress up from the lower doses to the target dose.  D.E. 4-11 ("Nayeri Decl.") ¶ 17. Patients typically take their tablets twice daily, indefinitely, irrespective of the dose on which they begin their regimens.  *Id.* ¶ 18.  According to Novartis, there is no need to distinguish between daily doses, because once adjusted to a particular dosage, patients remove the others from their medication cycle.  PI Reply at 4 n.4.

Novartis's position, in sum, is that the ENTRESTO® trade dresses were designed to differentiate the drug in the heart failure treatment market, rather than to improve cost, quality, or efficacy.  PI Mot. at 17.  MSN counters that under Third Circuit precedent, color-coding of drugs to convey dosage information is functional.  PI Opp'n at 12 (citing *Shire*, 329 F.3d 348).  Novartis does not dispute that the color-coding and size distinctions between dosages is functional but instead disputes that the particular colors chosen "do not confer an edge in usefulness."  Stay Opp'n at 25.  The Court agrees with MSN and addresses the particular colors next.  *See infra* IV. A. 1. b.

**NOT FOR PUBLICATION**

The Court finds that the distinctions between doses—based on color-coding and size—are likely functional because patients, physicians, and pharmacists rely on these distinctions of ENTRESTO® strengths to distinguish between the three different doses. Stay Reply at 10. The Court agrees with MSN that the color-coding and size of ENTRESTO® provides some "degree of clinical functionality"—just as Adderall did in *Shire*—because the record shows that ENTRESTO® patients, like Adderall patients, require some initial dosage titration and intermittent dosage adjustment. *Shire*, 329 F.3d at 354 (crediting the record that "color coding of a particular preparation of mixed amphetamine salts tablets confers a substantial degree of clinical functionality for the patient in the titration/adjustment process"); *see also* PI Reply at 4 n.4; Nayeri Decl. ¶ 18; D.E. 17-1 ("Nayeri Rebuttal Decl.") ¶ 30.

### b. The Particular Colors

Novartis argues that even if using color to distinguish doses is functional, "there is no functional reason to use the colors of white-violet, light yellow, and light pink." Stay Opp'n at 25. MSN argues that the particular colors are functional because by "using colors similar to those Entresto patients had become accustomed to," MSN achieves "the functional benefit of helping existing Entresto patients identify MSN's Drug as the correct drug." Stay Reply at 10 n.8.

The Court recognizes that MSN's identified feature of "helping existing Entresto patients identify the correct drug only by using colors similar to those Entresto patients had become accustomed to" inures to MSN's benefit in part because it associates MSN's Drug with Novartis's product. The Court agrees that the particular colors that Novartis chose were not innately functional. As the Third Circuit explained, "[f]or instance, though ironing-board pads need to use some color . . . to avoid noticeable stains, there is no functional reason to use green-gold in particular. Though French press coffeemakers need some handle, there is no functional reason to

**NOT FOR PUBLICATION**

design the particular handle in the shape of a "C." And though armchairs need some armrest, there is no functional reason to design the particular armrest as a trapezoid." *Ezaki Glico*, 986 F.3d at 257-58.

But drug products can differ in nature compared to ironing board pads, coffeemakers, and armchairs. "[D]rug color cases have more to do with public health policy regarding generic drug substitution than with trademark law." *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 169 (1995). Although there may have been no functional reason to have chosen violet white, pale yellow, and light pink in the first instance, those colors, once chosen can "come to represent to large numbers of those taking [the drugs] not its source but its ingredients and their effects." *Shire*, 329 F.3d at 358 n.20. Consequently, the colors can become

> functional to patients as well as doctors and hospitals; many elderly patients associate color with therapeutic effect; some patients comingle medications in a container and rely on color to differentiate one from another; colors are of some, if limited, help in identifying drugs in emergency situations; and use of the same color for brand name drugs and their generic equivalents helps avoid confusion on the part of those responsible for dispensing drugs.

*Inwood Laby's, Inc. v. Ives Laby's, Inc.*, 456 U.S. 844, 853 (1982). As a result, generic manufacturers that fail to mimic the RLD's color scheme can suffer "a significant disadvantage because the feature is 'essential to the use or purpose of the article' or 'affects [its] cost or quality.'" *Qualitex Co.*, 514 U.S. at 169 (quoting *Inwood Laby's, Inc.*, 456 U.S. at 850 n.10). This problem is of particular significance for patient populations who suffer from chronic illnesses, regularly comingle medications, and depend on a drug product's visual appearance to distinguish their medications from one another. *See Ives Laby's, Inc. v. Darby Drug Co., Inc.*, 488 F. Supp. 394, 399 (E.D.N.Y. 1980).[3]

---

[3] The Second Circuit reversed in *Ives Laby's, Inc. v. Darby Drug Co.*, 638 F.2d 538 (2d Cir. 1981) *sub nom.*, but the Supreme Court in turn reversed the Second Circuit in *Inwood Laby's, Inc. v. Ives*

**NOT FOR PUBLICATION**

The Court previously found that ENTRESTO®'s appearance "has an element of functionality" because it "can serve as useful visual cues for patients" and can provide "familiarity with a medication to be taken in seeming perpetuity." Opinion at *9. The Court appreciates the parties' thoughtful attention addressing the Declaration of Martin Shimer, the former Deputy Director of the FDA's Office of Generic Drugs. D.E. 13-46 ("Shimer Decl."). Shimer explains that mirroring the color scheme of the RLD helps to "ensure that patients are able to distinguish doses for similar products using the same functional cues as the color scheme of the branded RLD that a patient had been accustomed to receiving." Shimer Decl. ¶ 47. Shimer further explains that this is routine practice across the generic industry and helps avoid the uncertainty that would arise from generics using a different tablet size, shape, or color for their products. *Id.* ¶ 48 ("Patients rely upon visual cues and other distinguishing factors such as color and shape to both identify the kind of medication they are taking and how many times a day they take that medication.").

Considering the practical needs of patients with chronic illnesses and comorbidities who are often comingling multiple medications on a daily basis, the Court departs from the conclusion it reached in its prior Opinion. Analyzing functionality (or a lack thereof) of the particular colors of a drug product like ENTRESTO® differs in nature from the functionality of the particular colors chosen for products such as an ironing board pad. The Court therefore agrees with MSN and finds that the colors for ENTRESTO® are likely functional.

c.  Size and Shape

Relatedly, MSN also argues that the Court failed to address its evidence that it chose the shape and size of its pills for functional reasons. Stay Mot. at 20; Nithiyanandam Decl. ¶ 12

---

*Laby's, Inc.*, 456 U.S. 844 (1982). On remand from the Supreme Court, the Second Circuit affirmed the district court. *Ives Laby's., Inc. v. Darby Drug Co., Inc.*, 697 F.2d 291 (2d Cir. 1982).

**NOT FOR PUBLICATION**

("MSN's pills are ovaloid-shaped because that shape is very easy for patients to swallow. Ovaloid-shaped pills are also easier and more cost-effective for MSN to manufacture, including because they allow for a simpler mold design, more efficient use of the mold space, and more efficient coating and packaging processes. Indeed, hundreds if not thousands of other drug companies choose that ovaloid shape for their tablets for these functional reasons."). Although the Court agrees with Novartis that the functionality assessment turns on the plaintiff's trade dress, the Court nevertheless finds that the ovaloid shape and the size of Novartis's drug product are functional.

Shimer highlights the FDA's Physical Attribute Guidance[4] explaining the functionality of tablet size and shape. *Id.* (citing FDA Physical Attribute Guidance). For example, the FDA explains that survey data has shown "as many as 40 percent of Americans" have some difficulty swallowing tablets and capsules. FDA Physical Attribute Guidance at 2. "The size of the tablet or capsule influences esophageal transit, irrespective of patient factors and administration techniques." *Id.* Tablet shape affects esophageal transit time too. *Id.* at 3 ("Studies in humans have also suggested that oval tablets may be easier to swallow and have faster esophageal transit times than round tablets of the same weight.").

It is Novartis's burden to show that the ENTRESTO® trade dress is non-functional. *Shire*, 329 F.3d at 353. Yet, Novartis does not dispute that the size and shape of ENTRESTO® possess functionality. Stay Opp'n at 28-30; PI Brief at 17-20; PI Reply at 3-5. Instead, Novartis argues that it chose the ENTRESTO® trade dress "to distinguish ENTRESTO® from competitors' products." D.E. 17 at 3. But "product design almost invariably serves purposes other than source identification." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 213 (2000). And here,

---

[4] U.S. Food & Drug Admin., Size, Shape, and Other Physical Attributes of Generic Tablets and Capsules: Guidance for Industry (June 2015), https://www.fda.gov/media/87344/download (hereinafter "FDA Physical Attribute Guidance").

**NOT FOR PUBLICATION**

even if Novartis chose the shape and size of ENTRESTO® to distinguish it from other medications, the shape and size still seem to affect administrability of the medication and transit time after ingestion. The Court therefore credits Shimer's declaration and the FDA Physical Attribute Guidance here and finds that, like the colors of ENTRESO®, the size and shape of Novartis's drug products are likely also functional.

Because size, shape, and color all appear to be functional features of ENTRESTO®, the Court finds that MSN established that it is likely to succeed on appeal, with respect to the merits of its trade dress infringement claim under the Lanham Act. *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309 (3d Cir. 2014). The Court now considers whether Novartis will face irreparable harm if the Court stays its preliminary injunction during the pendency of MSN's appeal.

### B. Irreparable Harm

The Trademark Modernization Act ("TMA") created a rebuttal presumption of irreparable harm, provided a likelihood of success on the merits is demonstrated. *Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 184-85 (3d Cir. 2022); 15 U.S.C. § 1116(a). "Because the TMA does not explain how its rebuttable presumption applies, courts follow the Federal Rules of Evidence in this context." *Aljess LLC v. Tun Tavern Legacy Foundation Inc.*, No. 24-2388, 2024 WL 4988972, at *10 (E.D. Pa. Dec. 4, 2024). Federal Rule of Evidence 301 states that "the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally." The Court, therefore, must ask "whether the rebuttal evidence is enough to allow a reasonable factfinder to conclude that irreparable harm is unlikely." *Nichino*, 44 F.4th at 185.

The Court acknowledges it used the incorrect framework in its Opinion. The Court, however, also acknowledges that because the Court here finds that MSN has shown that it is likely

12

NOT FOR PUBLICATION

to succeed on the merits of its appeal, the statutory presumption does not apply to Novartis. Instead, Novartis must show that it "specifically and personally risks irreparable harm" during the pendency of the appeal. *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009); *see also Del. State Sportsmens' Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 204-05 (3d Cir. 2024) ("[Challengers] must show that, without a preliminary injunction, they will more likely than not suffer irreparable injury while proceedings are pending."). "Grounds for irreparable injury include loss of control over reputation, loss of trade, and loss of good will," but injuries "measured in solely monetary terms cannot constitute irreparable harm." *Buzz Bee Toys, Inc.*, 20 F. Supp. 3d 483, 510 (D.N.J. 2014) (quoting *Kos Pharms.*, 369 F.3d at 726). Novartis argues that it will suffer irreparable harm through loss of control over its reputation and loss of trade in the form of lost sales. PI Mot. at 37-38. For the reasons explained below, the Court here finds that for the pendency of MSN's appeal, MSN's evidence persuasively shows that irreparable harm to Novartis is unlikely.

The Court begins by addressing its prior finding that Third Circuit precedent dictated the outcome of Novartis's reputational harm theory. Opinion at *9 (quoting *Opticians Ass'n of Am. v. Ind. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990)). In *Opticians Association*, the Third Circuit held that "likelihood of confusion is inevitable, when . . . the identical mark is used concurrently by unrelated entities." *Id.* The Third Circuit agreed with the admonition that "[c]ases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports. Such cases are 'open and shut' and do not involve protracted litigation to determine liability for trademark infringement." *Id.* (quoting 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 23:7 (2d ed. 1984)). Here, however, the Court found it unlikely that trade dress protects the size, shape, and colors of ENTRESTO®. *See supra* IV. A.

13

Without a mark, this case is not an "open and shut" one and *Opticians Association of America* does not require holding that irreparable harm is a given.

The Court must then address the merits of Novartis's theory of reputational harm. Novartis argues that "*if* the MSN Drug is defective, causes severe side effects . . . , or otherwise leads to safety concerns," Novartis's reputation will suffer the consequences. PI Mot. at 37-38 (emphasis added). In particular, Novartis points to MSN's proposed drug label, which omits dosing information that Novartis includes in its ENTRESTO® label. *Id.* Novartis's expert, Dr. Nayeri, also states that physicians may inadvertently refer to the drug label for MSN's Drug while prescribing ENTRESTO® and that reference to the label for MSN's Drug could result in dosing errors, thereby causing harm to patients and drawing disdain from HCPs. PI Reply at 13 (citing Nayeri Decl. ¶¶ 30-45). Finally, Novartis raises concerns that MSN's Drug has a higher risk of contamination by virtue of being manufactured in countries where some other drugs have had quality control problems. Nayeri Rebuttal Decl. ¶ 10. MSN calls this speculation. Stay Mot. at 11. The Court agrees with MSN.

Safety has long fallen under the purview of the FDA. *See, e.g.*, *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360, 1369 (Fed. Cir. 2023). Here, the FDA has reviewed MSN's proposed drug label. *See Novartis Pharms. Corp. v. Becerra*, No. 24cv2234 (DLF), 2024 WL 3823270, at *6 (D.D.C. Aug. 13, 2024) (crediting "the FDA's judgment on [MSN's proposed drug label], which is set forth in 10-pages of highly technical analysis, [as] thorough and well-reasoned"). In the absence of evidence indicating that MSN's Drug actually is defective, will cause severe side effects, or will otherwise present safety concerns, the Court declines to assume that MSN's Drug—which can launch only if approved by the FDA and deemed bioequivalent to ENTRESTO®—is not as safe. The Court also agrees with MSN that Novartis's purported

**NOT FOR PUBLICATION**

scenario—where Novartis's reputation bears the blame when HCPs prescribe the wrong dose of ENTRESTO® after consulting the label for MSN's Drug after being led astray by images of MSN's Drug—is too speculative[5] for the Court to rely on and is credibly disputed by the opinion of MSN's expert Dr. Ardehali.  PI Reply at 13; D.E.13-49 ("Ardehali Decl.") ¶¶ 35-39.  Indeed, Novartis's expert opinions are hedged as scenarios that "could" occur.  Ward Decl. ¶ 20 ("certain patients *could* receive a higher dose than is directed by the Entresto label"), ¶ 21 ("A patient . . .  *could* believe the MSN Generic is Entresto . . . .") (emphasis added in both); Nayeri Decl. ¶  29 ("An HCP *could* inadvertently mix up two drugs based on their appearance or confusingly similar manufacturer names. . . . Exposure to that information *could* lead HCPs to consult the generic's FDA-approved label and packaging insert . . . rather than through the branded drug's FDA-approved label and packaging insert. . . . "HCP confusion—and the inadvertent reference to the generic's prescribing information, rather than Entresto's prescribing information—*could* lead to patient harm. A confused HCP *might* fail to prescribe a reduced dosing regimen . . . .") (emphasis added in all).  No particularized evidence indicates that these scenarios actually would occur.

And Novartis's concerns that contamination issues may affect MSN's Drug (and thereby Novartis's reputation) simply because some other drug manufacturers have faced similar issues in those countries of manufacture, is not enough to show that Novartis *specifically* and *personally* risks irreparable harm.  PI Mot. at 38; *Liberty Lincoln-Mercury, Inc.*, 562 F.3d at 557.  Thus, the

---

[5] Novartis also argues that this inadvertence will result in patients receiving MSN's Drug instead of ENTRESTO®.  PI Reply at 13.  Novartis does not explain how a patient will nevertheless receive MSN's Drug after a HCP erroneous reviews the label for MSN's Drug and erroneously prescribes the wrong dose of ENTRESTO®.  *Id.*

**NOT FOR PUBLICATION**

Court agrees with MSN that Novartis has not shown that it is likely to face irreparable reputation-based harm.

The Court next addresses Novartis's economic-based theories of irreparable harm. Novartis argues that it will suffer loss of trade if "illegal substitution occurs or if confused patients request refills of the MSN Drug, rather than ENTRESTO®, through resources like Amazon Pharmacy or Medipod." PI Mot. at 38. Novartis also adds that it will lose sales to MSN. Robbins Decl. ¶¶ 18-27. Neither of Novartis's arguments are persuasive because Novartis provides no evidence that illegal substitution is likely to occur, nor does Novartis explain why its other injuries are not compensable by monetary damages. "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015). Courts in this district and in others regularly find that lost sales are compensable injuries. *See, e.g.*, *Otsuka Pharm. Co., Ltd. v. Torrent Pharms. Ltd., Inc.*, 99 F. Supp. 3d 461, 501 (D.N.J. 2015) (collecting cases). This Court follows suit.

The parties have also clarified that irrespective of this Court's injunction, MSN is barred from launching its generic drug product before at least July 16, 2025. Stay Opp'n at 4-5 (citing *In re Entresto (Sacubitril/Valsartan) Patent Litig.*, No. 20-md-2930-RGA (D. Del.), D.E. 1823); *see also* D.E. 49 ("all patent barriers to MSN's entry will end by July 16, 2025"); D.E. 50 ("Novartis disagrees with MSN's representation that 'all patent barriers to MSN's entry will end by July 16, 2025 at the latest.'"). While this Court cannot predict the decisions of another, the Court is satisfied

**NOT FOR PUBLICATION**

that any harm to Novartis resulting from a stay of this Court's injunction will be temporally limited and not irreparable.[6]

Having determined that the two "gateway factors" appropriately favor MSN, the Court will stay its injunction for the pendency of MSN's appeal. *Reilly*, 858 F.3d at 179. Although the Court need not address the balance of equities and public interest prongs, the Court references its prior Opinion and finds that because trade dress does not apply, those factors now also favor staying the Court's injunction. Opinion at 18 ("There is no question that MSN would suffer significant hardship if enjoined. . . . The Court is also mindful of the societal benefits of affordable alternatives to brand-name drugs and laments obstacles to such access.").

## V.    CONCLUSION

For the reasons stated above, the Court will **GRANT** MSN's Motion for a Stay Pending Appeal. An appropriate Order accompanies this Opinion.

Dated: May 22, 2025

Evelyn Padin, U.S.D.J.

---

[6] Novartis itself agrees that when "the time between the request for a preliminary injunction and the court's decision on the merits" is limited, that time serves as "an important limit on the harm." PI Reply at 12 n.13.

# EXHIBIT D

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NOVARTIS AG and NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>        Plaintiffs,<br><br>v.<br><br>NOVADOZ PHARMACEUTICALS LLC, *et al.*,<br><br>        Defendants. | No. 25cv849 (EP) (JRA)<br><br>**ORDER** |

Defendants MSN Laboratories Private Limited, MSN Pharmaceuticals Inc., and Novadoz Pharmaceuticals LLC (collectively, "MSN") move to stay the Court's order granting Plaintiffs Novartis AG and Novartis Pharmaceuticals Corporation's motion for a preliminary injunction. D.E. 37 ("Motion to Stay"). Having reviewed the parties' submissions and all other relevant items on the docket, and having determined that oral argument is not necessary,

**IT IS**, on this **22ⁿᵈ** day of May 2025, for the reasons set forth in the accompanying Opinion,

**ORDERED** that MSN's Motion to Stay, D.E. 37, is **GRANTED.**

_____

Evelyn Padin, U.S.D.J.

**EXHIBIT E**

<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NOVARTIS AG and NOVARTIS PHARMACEUTICALS CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> NOVADOZ PHARMACEUTICALS LLC, *et al.*, <br><br> Defendants. | No. 25cv849 (EP) (JRA) <br><br> **OPINION** |

**PADIN, District Judge.**

This matter comes before the Court by way of Plaintiffs Novartis AG and Novartis Pharmaceuticals Corporation's (together, "Novartis") motion for a preliminary injunction against Defendants MSN Laboratories Private Limited, MSN Pharmaceuticals Inc., and Novadoz Pharmaceuticals LLC (collectively, "MSN") for alleged infringement of Novartis's trademark and trade dress rights. D.E. 4 ("Motion" or "Mot."). The Court decides the Motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, the Court will **GRANT in part** and **DENY in part** the Motion.

## I. BACKGROUND

Novartis is a pharmaceutical company that manufactures ENTRESTO®, an FDA-approved heart failure prescription medication that was launched in 2015. D.E. 1 ¶¶ 3, 52-53 ("Compl."). It is the number one heart failure brand prescribed by physicians and has helped reduce the risk of

death and hospitalization for over 2.5 million patients.  *Id.* ¶ 3.  Novartis's generic partner is Sandoz, which used to be Novartis's wholly-owned generics division prior to its sale.  *Id.* ¶ 7.

ENTRESTO® is offered in three doses, each in a unique combination of size, shape, and color.  *Id.* ¶ 59.  The Low Starting Dose, a 24/26 mg dose, is a violet white oval tablet, measuring 13.1 mm x 5.2 mm; the Recommended Starting Dose, a 49/51 mg dose, is a pale yellow oval tablet, measuring and 13.1 mm x 5.2 mm; and the Target Dose, a 97/103 mg dose, is a light pink oval tablet, measuring 15.1 mm x 6.0 mm.  *Id.*  Images of the drug show that the face of each pill is marked "NVR."  D.E. 4-4 ¶ 15 ("Valazza Decl.").

Novartis alleges that MSN will imminently bring to market a generic version of ENTRESTO®, under the NOVADOZ name, intending to confuse healthcare providers and consumers into believing NOVADOZ is affiliated with Novartis (the "MSN Drug").  Compl. ¶¶ 6-7.

MSN submitted an Abbreviated New Drug Application ("ANDA") for its generic equivalent to ENTRESTO® on July 7, 2019.  D.E. 13-7 ¶ 3 ("Nithiyanandam Decl.").  To be eligible for FDA approval through an ANDA, a generic drug must contain the same active ingredient(s) of the branded drug, come in the same dosage form, and deliver the same dose.  *Id.* ¶ 4.  As a result, the MSN Drug also comes in three tablets: a 24/26 mg tablet, 49/51 mg tablet, and a 97/103 mg tablet.  *Id.* ¶ 5.  MSN's 2019 ANDA contained proposed dimensions of the drugs, respectively measuring 10 x 4 mm, 13 x 5.10 mm, and 15 x 5.9 mm.  *Id.* ¶ 6.  Images of the MSN

Drug show that the face of each pill is marked "M." *Id.* The pills are not identical, but strikingly similar.



| PARAMETERS | REFERENCE LISTED DRUG | PROPOSED DRUG PRODUCT |
|---|---|---|
| Strengths | 24 mg/ 26 mg, 49 mg / 51 mg and 97 mg/ 103 mg | 24 mg/ 26 mg, 49 mg / 51 mg and 97 mg/ 103 mg |
| **Configuration** | | |
| 24 mg/ 26 mg, 49 mg / 51 mg and 97 mg/ 103 mg | Bottle of 60's and 180's | Bottle of 60's and 180's |
| 24 mg/ 26 mg | | |
| 49 mg/ 51 mg | | |
| 97 mg/ 103 mg | | |
| **Dimensions** | | |
| 24 mg/ 26 mg | 13.35 x 5.33 | 10.00 X 4.00 mm |
| 49 mg/ 51 mg | 13.25 x 5.30 | 13.00 X 5.10 mm |
| 97 mg/ 103 mg | 15.34 x 6.12 | 15.00 X 5.90 mm |
| Active Ingredient | Sacubitril and Valsartan | Sacubitril and Valsartan |

*Id.*

Novartis avers that the physical similarities between NOVADOZ and ENTRESTO®, as well as NOVADOZ's name—purportedly intended to invoke a combination of Novartis and Sandoz—reflects an intentional effort to deceive the marketplace. Compl. ¶ 7. The launch of NOVADOZ hinges on the lift of an injunction in place in a separate patent appeal pending before the Federal Circuit. *Id.* ¶ 89. MSN's counsel has "expressly communicated to Novartis's counsel that MSN will seek to launch the MSN Drug in the window between the issuance of the Federal Circuit's mandate, and the Delaware District Court's further orders once the case is returned after appeal." *Id.*

Novartis brings claims for trademark infringement, false designation of origin, trade dress infringement, and unfair competition. *Id.* ¶¶ 128-205. It argues that patients will face imminent health risks as the MSN drugs do not have FDA-approved dosing instructions and will be confused

3

with ENTRESTO®. Mot. at 3. Specifically, the ENTRESTO® label and prescribing information directs certain patients to start with a low starting dose, while the MSN drug label and prescribing information does not. *Id.* at 14-15. Novartis argues it will face reputational damage and loss of trade in the form of lost sales. *Id.* at 37.

## II.    PROCEDURAL HISTORY

Novartis's Motion also sought a temporary restraining order. Mot. This Court denied Novartis's request for temporary restraints but ordered expedited briefing on the preliminary injunction motion. D.E. 7. MSN's opposition, D.E. 13 ("Opp'n"), and Novartis's reply, D.E. 17 ("Reply"), followed.

## III.    LEGAL STANDARD

"Preliminary injunctions and TROs are extraordinary remedies that are not routinely granted." *Gentile v. Secs. and Exch. Comm'n*, No. 19-5155, 2019 WL 1091068, at *2 (D.N.J. Mar. 8, 2019) (citing *Kos Pharm., Inc. v. Andrx. Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)). The decision to grant such relief is within the discretion of the district court. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). In order to obtain a TRO or a preliminary injunction, the moving party must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (citing *Del. River Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)).

The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179. A court may issue an injunction to a plaintiff "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) (internal marks and citations omitted); *see also P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) ("The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate.").

## IV.    ANALYSIS

### A.    Trade Dress

"A plaintiff must prove three elements to establish trade dress infringement under the Lanham Act: '(1) the allegedly infringing design is nonfunctional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product.'" *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309 (3d Cir. 2014) (quoting *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007)).

> *1.    Novartis has adequately shown the ENTRESTO® trade dress is non-functional*

"A nonfunctional feature is one that 'is unrelated to the consumer demand . . . and serves merely to identify the source of the product or business.'" *EBIN New York, Inc. v. Kiss Nail Prods., Inc.*, No. 23-2369, 2024 WL 1328029, at *6 (D.N.J. Mar. 28, 2024) (quoting *Fair Wind*, 764 F.3d at 311). "Conversely, a functional feature is 'one that is essential to the use or purpose of the article, affects the cost or quality of the article, or one that, if kept from competitors, would put

5

them at a significant non-reputation-related disadvantage.'" *Id.* (quoting *Fair Wind*, 764 F.3d at 310). In the case of drugs, "the allegedly nonfunctional element must not enhance efficacy." *SK & F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1063 (3d Cir. 1980).

MSN argues that communication of functional information to patients—what drug each pill is and what dose it contains—is evidenced by the colors and sizes of the ENTRESTO® pills. Opp'n at 13. It further indicates that consistent color-coding systems can reduce therapeutic errors in other drug regimens. D.E. 13-40 ¶ 53 ("Clark Decl."). Novartis attests that it is unaware of "any functional reason why the Low Starting Dose and the Recommended Starting Dose need to be smaller than the Target Dose. These sizes could be made uniform without impacting the efficacy of the formulation." Valazza Decl. ¶ 20. The selection of size and shape of the pills, therefore, was purely based on a desire to differentiate the tablets from competitors' trade dresses. *Id.* ¶ 16. And while ENTRESTO® comes in three doses, patients can progress up from the lower doses to the target dose. D.E. 4-11 ¶ 17 ("Nayeri Decl."). Patients typically take their tablets twice daily, indefinitely, irrespective of the dose on which they begin their regimens. *Id.* ¶ 18. There is no need to distinguish between daily doses, because once adjusted to a different dosage, patients remove the others from their medication cycle. Reply at 4 n.4.

Novartis's position, in sum, is that the ENTRESTO® Trade Dresses were designed to differentiate the drug in the heart failure treatment market, rather than to improve cost, quality, or efficacy. Mot. at 17. MSN counters that under Third Circuit precedent, color-coding of drugs to convey dosage information is functional. Opp'n at 12 (citing *Shire US Inc. v. Barr Labs., Inc.*, 329 F.3d 348 (3d Cir. 2003)).

On appeal in *Shire* was the lower court's finding that the color and shape of Adderall is non-functional, accepting the position of the generic's manufacturer that the similar color-coding

and shape of products are meaningful for ADHD patients and enhance efficacy. 329 F.3d at 354. The Third Circuit noted other cases crediting testimony bearing on functionality. In *Ives Labs., Inc. v. Darby Drug Co.*, 488 F. Supp. 394 (E.D.N.Y. 1980),[1] for example, the court found that the capsule colors of the prescription drug cyclandelate were functional because "many elderly patients associate the appearance of their medication with its therapeutic effect," "some patients co-mingle their drugs in a single container and then rely on the appearance of the drug to follow their doctors' instructions," and "to some limited extent color is also useful to doctors and hospital emergency rooms in identifying overdoses of drugs." *Id.* at 398-99. The Supreme Court also "commented on the functional nature of the color of medical pills," *Shire*, 329 F.3d at 358, in *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159 (1995). The Court noted there that "competitors might be free to copy the color of a medical pill where that color serves to identify the kind of medication (*e.g.*, a type of blood medicine) in addition to its source." *Qualitex*, 514 U.S. at 169.

Novartis argues that *Shire* is distinguishable because it uniquely involved Adderall, a controlled substance; patients needed to distinguish between differing doses of Adderall throughout the day; and patients with ADHD rely on visual cues in making dosing adjustments. Reply at 4. As the lower court did in *Shire*, this Court will assess and credit testimony as it pertains to the facts of this case specifically. For the reasons below, it finds that *Shire* is distinguishable.

The parties' experts have competing but overlapping arguments for why a pill's distinctive (or similar) appearance is important for patients. Novartis's expert notes that drug shape and color can be helpful for patients to identify their prescriptions. D.E. 4-10 ¶ 13 ("Robbins Decl."). Drug

---

[1] The Supreme Court granted certiorari and reversed the judgment of the Second Circuit, which had reversed the district court.

appearance is particularly important for patients with chronic conditions such as chronic heart failure because they are more familiar with an appearance of a medication they take repeatedly, over a long period of time, and patients with chronic conditions are more likely to take multiple medications relative to others. *Id.* ¶ 14. Dr. Mark Robbins proffers that "pill appearance can be an important element of pharmaceutical branding," while also noting that images of a pill design can reinforce "that visual cues like shape and color" are intended to serve as reference points for patients to identify their prescribed medication. *Id.* ¶¶ 16-17. MSN's expert, Todd Clark, in a roundabout way, makes a similar point: that changes in physical attributes from the branded to generic drug can negatively affect therapeutic adherence. Clark Decl. ¶ 17. Patients used to identifying medication based on visual cues should have the option to switch to generic drugs with those same visual cues so as to not disrupt their drug regimen compliance. *Id.* ¶ 18. Dr. Robbins counters that a noticeable change in pill appearance is an important signal to patients that their medication is being switched. Robbins Decl. ¶ 18. Clark rebuts that the benefits offered by continuity of appearance outweigh the hypothetical downside of potential loss of patient autonomy. Clark Decl. ¶ 19.

An MSN executive also explains that in addition to following FDA guidance that generic tablets should have similar physical characteristics to their branded equivalents, MSN picked colors referencing those used for ENTRESTO® pills so that patients can rely on visual cues to identify what drug and dose they are taking. Nithiyanandam Decl. ¶¶ 8-10. The MSN Drug's shape similarity is justified by way of functionality; ovaloid-shaped pills are easier to swallow and more cost-effective to manufacture, and it is industry practice to use larger pills to designate higher doses. *Id.* ¶¶ 12-13. Nithiyanandam goes on to explain that MSN mirrored the functional features of ENTRESTO®, but distinguished them just enough based on the small-font letter markings,

marginal size differences, and color-shading distinctions. *Id.* ¶ 15. In sum and substance, MSN contends that it had to copy ENTRESTO® for functionality purposes, but stopped just short of copying it too much to infringe on the trade dress.

The Court credits the position that distinctive identifiers of medications can serve as useful visual cues for patients, particularly more vulnerable populations such as the elderly or others with comorbidities, and that familiarity with a medication to be taken in seeming perpetuity has an element of functionality. Simultaneously, the Court is wary of expanding this concern across every widely available drug. The functionality doctrine cannot stand for the broader proposition that any distinctive look and feel of a pill means generic brands are free to wholesale copy them under the guise of ensuring patients, whose medication is prescribed by doctors, know what they are taking. Simply put, MSN could have just picked different colors. Or different shapes. Or different sizes.

The Court understands MSN's reliance on *Shire* and takes note of Novartis's omission of it from its moving brief. But the Court's diversion from *Shire*'s holding has less to do with the fact that a controlled substance was uniquely at issue in that case, and more to do with the practical distinctions here. Adderall dosing is more involved. Many patients "may take multiple daily dosages of different strength." *Shire*, 329 F.3d at 354. Safety and compliance is also at greater issue in cases of children, whose doses may be dispensed through non-medical intermediaries. *Id.* at 355. ENTRESTO® patients need not distinguish between daily doses, because the patients remove previous ones from their medication cycle after they adjust to a different dosage. D.E. 17-1 ¶¶ 31-32 ("Nayeri Reb. Decl."). They are taking one type of pill in a day.

As to MSN's position that similarities in physical attributes between drugs helps reduce medication errors, increases therapeutic adherence, and maintains placebo effects, Clark Decl. ¶ 50, the Court notes that "regardless of whether the generic is identical in appearance to the brand

name, the patient ought to be-and usually is-told that a generic medication is now being dispensed." *Boehringer Ingelheim G.m.b.H. v. Pharmadyne Labs.*, 532 F. Supp. 1040, 1047 (D.N.J. 1980). The patient will be aware of the substitution, *id.*, and the Court is unpersuaded that mirroring— entirely or substantially—the appearance of a pill so that patients associate their new medication with the old one means that the initial distinctive appearance is functional. Having found that Novartis has met its burden in demonstrating that the trade dress is likely not functional, the Court turns to whether it has done so for secondary meaning.[2]

## 2. *Novartis has sufficiently demonstrated secondary meaning*

Novartis must next show that "in the minds of the public," the primary significance of the trade dress is "to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)) (internal marks omitted). Courts consider factors such as "the extent of sales and advertising leading to buyer association, length of use, exclusivity of use, the fact of copying, customer surveys, customer testimony, the use of the mark in trade journals, the size of the company, the number of sales, the number of customers, and actual confusion" in determining whether secondary meaning exists. *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991).

Novartis has adequately demonstrated the size of the company, the number of sales, and the number of customers. *Id.* It is one of the most well-known global pharmaceutical companies

---

[2] The Court does not find that the trade dress is generic. Opp'n at 16. In trade dress law "the inquiry into functionality resembles the genericness inquiry in trademark law." *Duraco Prods., v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1442 (3d Cir. 1994). And the Court agrees with Novartis that the relevant market is Novartis's competitors. Reply at 6 (citing *McNeil Nutritionals, LLC v. Heartland Sweeteners LLC*, 566 F. Supp. 2d 378, 390 (E.D. Pa. 2008)). Obviously, there is a finite amount of shapes and sizes that pills can come in. Opp'n at 17. But the Court is satisfied that enough distinctions exist to determine that ENTRESTO® is not generic. Mot. at 18.

with net sales exceeding $45.4 billion in 2023.  D.E. 4-3 ¶¶ 6 ("Miller Decl.").  It is estimated to have helped over 284 million people worldwide in 2023.  *Id.*  As to ENTRESTO® specifically, it has generated more than $10.5 billion in cumulative net sales in this country between 2015 and 2023.  *Id.* ¶ 26.  Novartis estimates that over 2.5 million people have used ENTRESTO® to help with heart failure.  *Id.* ¶ 25.  MSN's opposition focuses primarily on exclusivity of use and buyer association, which the Court will address in turn.

*First*, although the shape, size, and colors of ENTRESTO® *alone* do not achieve secondary meaning, the Court finds that the length and exclusivity of use of the trade dress weighs in Novartis's favor.  ENTRESTO® has been the only drug of its kind available to treat patients with heart failure for the last nine years.  D.E. 4-5 ¶ 8.  MSN does not dispute this, but instead argues that because the trade dress consists of ubiquitous sizes, shapes, and colors, these features cannot be used to identify Novartis.  Opp'n at 19.  Of course, color alone is not inherently distinctive, *Wal-Mart*, 529 U.S. at 212, but MSN seems to just repackage its argument about genericness here.  And color, "in combination with other characteristics," can be protectable.  *See Smithkline Beckman Corp. v. Pennex Prods. Co., Inc.*, 605 F. Supp. 746, 750 (E.D. Pa. 1985).  Under MSN's theory, *no* drug could ever receive trade dress protection because there is a finite universe of size, shape, and color options.  ENTRESTO® is "the number one branded treatment for heart failure prescribed by cardiologists" and has been on the market since 2015.  Miller Decl. ¶¶ 19-20.  The Court is satisfied that Novartis's continuous marketing of this trade dress weighs in favor of the exclusivity and length elements.  *See Ciba-Geigy Corp. v. Bolar Pharm. Co., Inc.*, 747 F.2d 844, 852 (3d Cir. 1983).

*Second*, MSN argues that, despite Novartis's expansive marketing campaign, it has not adequately shown buyer association with ENTRESTO®.  Opp'n at 19-20.  Courts do "place

particular weight in customer surveys and testimony because, though they 'are not dispositive, they are the only direct evidence of secondary meaning.'" *Richardson v. Cascade Skating Rink*, No. 19-8935, 2024 WL 3841942, at *8 (D.N.J. Aug. 16, 2024) (quoting *King of Prussia Dental Assocs., Ltd. v. King of Prussia Dental Care, LLC*, No. 19-1688, 2019 WL 2240492, at *12 (E.D. Pa. May 23, 2019)).  Novartis does offer very little by way of direct consumer testimony.  But it does offer testimony that a prescriber "recognize[d] Entresto just by seeing the pills." Nayeri Decl. ¶ 20.

The Court also disagrees with MSN's characterization of Novartis' marketing materials as highlights of the doses associated with each pill to the exclusion of the pills' source.  Opp'n at 20. Although the marketing materials often provide instructions on how to take the trio of doses, *see, e.g.*, D.E.s 4-54, 4-55, 4-58, these materials have "routinely featured the [pills'] physical appearance in pictures as well as described them in words," *Ciba-Geigy Corp. v. Bolar Pharm. Co., Inc.*, 547 F. Supp. 1095, 1101 (D.N.J. 1982), *aff'd*, 747 F.2d 844.  The Court fails to see how instructions on initiating dosing washes away "promotional efforts . . . not only to familiarize" consumers with the name ENTRESTO® "but also with [ENTRESTO®'s] appearance." *Boehringer*, 532 F. Supp. at 1056.  Accordingly, the Court finds that Novartis has met its burden and demonstrated the trade dress has likely achieved secondary meaning.

### 3.    *Likelihood of confusion*

To determine the final element of a trade dress infringement claim, courts in this district use the Third Circuit's ten-factor test, known as the *Lapp* factors:

> (1) the degree of similarity between the plaintiff's trade dress and the allegedly infringing trade dress;
>
> (2) the strength of the plaintiff's trade dress;
>
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used its trade dress without evidence of actual confusion arising;

(5) the intent of the defendant in adopting its trade dress;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other facts suggesting that the consuming public might expect the plaintiff to manufacture a product in the defendant's market, or that the plaintiff is likely to expand into that market.

*McNeil*, 511 F.3d at 358 (citing *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 471 (3d Cir. 2005), further citing *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)).

Factors 4 and 6 are neutral because MSN has not yet launched the MSN Drug. Mot. at 27. The Court addresses the remaining factors as follows.

    *a.    Factor 1: degree of similarity*

There is no question that the two trade dresses are strikingly similar.



| Image of ENTRESTO® Tablet | | |
|---|---|---|
| Image of MSN's Tablet[52] | | |
| Dosage | 24/26 mg | 49/51 mg | 97/103 mg |

Compl. ¶ 93.

This is true despite the different markings on the pills, because "[t]he proper test is 'not side-by-side comparison' but 'whether the labels create the same overall impression when viewed separately.'" *Kos*, 369 F.3d at 713 (quoting *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 477 (3d Cir. 1994)). This factor weighs in favor of Novartis.

b.    *Factor 2: strength of trade dress*

MSN makes the same arguments regarding functionality and secondary meaning with respect to the strength of the trade dress. Opp'n at 23. The Court adopts its reasoning regarding these arguments, *supra*, Sections IV.A.1-2, and finds this factor favors Novartis.

c.    *Factor 3: consumer care in purchase*

The Court agrees with MSN that because the products at issue are prescription medications, the relevant market consists primarily of medical professionals, not consumers. Opp'n at 24; *see Astrazeneca AB v. Dr. Reddy's Labs., Inc.*, 145 F. Supp. 3d 311, 317 (D. Del. 2015). This factor weighs in favor of MSN.

d.    *Factor 5: intent to infringe*

Although awareness of Novartis's trade dresses does not demonstrate bad faith, the Court still finds this factor weighs in Novartis's favor. The Court already rejected MSN's functionality argument, *supra*, Section IV.A.1, so it declines to adopt MSN's position that the evidence unequivocally demonstrates that the similar appearances were driven by functional and regulatory considerations. Opp'n at 25. While the functionality arguments necessarily overlap with those demonstrating an interest in providing visual cues to patients shifting from a branded drug to a generic drug, it does also demonstrate that MSN intended for the pills to look similar. The totality of the circumstances here results in this factor favoring Novartis. *Astrazeneca*, 145 F. Supp. 3d at 317.

e.    *Factors 7-10: competition and overlap*

The Court is persuaded by the District Court of Delaware's analysis in dealing with a branded product and generic, also finding that "[Novartis] and [MSN] are still competing in the same market for the same consumers in the first instance, even if [MSN] is ultimately competing against other generics once the decision to buy a generic has been made." *Id.* at 318. These factors

weigh in favor of Novartis.  Accordingly, Novartis has demonstrated a likelihood of confusion and a likelihood to prevail on its trade dress infringement claim.

4.    *Irreparable harm*

"[A] party seeking a preliminary injunction in a Lanham Act case is not entitled to a presumption of irreparable harm but rather is required to demonstrate that she is likely to suffer irreparable harm if an injunction is not granted."  *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 217 (3d Cir. 2014).[3]  Novartis argues that it will suffer irreparable harm through loss of control over its reputation (if MSN's drug is defective) and loss of trade in the form of lost sales (if patients request refills of the MSN Drug, instead of ENTRESTO®).  Mot. at 37-38.  MSN counters that Novartis's multi-year delay in bringing this action militates against injunctive relief and that its reputational harm theory is too speculative.  Opp'n at 34-35.

a.    *The delay here does not vitiate irreparable harm*

Third Circuit caselaw "may imply that inexcusable delay"—*i.e.,* not attributable to negotiations between the parties—"could defeat the presumption of irreparable harm in an appropriate case[.]"  *Kos*, 369 F.3d at 727.  Though the parties dispute the timeline of Novartis's knowledge of the MSN Drug's appearance, whether Novartis did in fact delay its request for injunctive relief is "most relevant for purposes of the Court's consideration of irreparable harm."  *Otsuka Pharm. Co., Ltd. v. Torrent Pharm. Ltd., Inc.*, 99 F. Supp. 3d 461, 504 (D.N.J. 2015).

MSN represents that in the course of the parties' patent claim litigation, MSN produced to Novartis a complete copy of its ANDA, including comparator images of the drugs, in 2020.  D.E. 13-2 ¶ 21.  It also states that it provided Novartis physical samples of MSN's pills for testing in

---

[3] Novartis misstates the law on this point, arguing it is entitled to a presumption of irreparable harm.  Mot. at 37.  The Third Circuit clarified the standard for irreparable harm in Lanham Act cases.  *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 203 (3d Cir. 2014).

January 2021.  *Id.* ¶ 22.  Nonetheless, MSN avers, Novartis never raised concerns with the appearance of MSN's pills.  *Id.* ¶ 23.  If this information is accurate, it would assuredly counsel against a finding of irreparable harm.

However, Novartis provides further context; the ANDA was produced in that MDL "confidential[ly] pursuant to Delaware Local Rule 26.2."  D.E. 17-3 ¶ 18 (citing D.E. 13-10 at 1). Delaware Local Rule 26.2 states that if documents are deemed confidential by the producing parties who have not stipulated to a confidentiality agreement, disclosure is limited to trial counsel and where appropriate, those who have been admitted *pro hac vice*, and the individuals remain "under an obligation to keep such documents confidential and to use them **only for the purpose of litigating the case**." (emphasis added).  On September 18, 2020, Judge Stark entered a protective order in the MDL, designating "abbreviated new drug applications (ANDAs) and related FDA correspondence, Drug Master Files, test data relating to physical and/or chemical properties, and materials concerning research and development" as attorneys' eyes only and limiting disclosure to those designated as a qualified person, including specific people involved in or retained for the purpose of that litigation.  *Id.* ¶¶ 11-12.  The protective order further limited the use of protected information to the MDL actions.  *Id.* ¶ 16.

True, practically speaking, Novartis has known about the MSN Drug's purported similar appearance to ENTRESTO® for many years.  And the Court is not naïve to a multi-district strategy of litigation based on numerous legal theories to prevent the MSN Drug from hitting the market. But for purposes of *this* case, at earliest, someone from Novartis could have learned about the MSN Drug's physical appearance through a written description of the drug in an exhibit filed in separate litigation on August 6, 2024.  *Id.* ¶ 28.  At earliest, images of the drug were seen on August

9, 2024, during oral argument in the MDL, though even that visual would presumably be covered by the protective order limiting its use to those actions.  *Id.* ¶ 29.

The exhibit describing the MSN Drug's physical appearance is fair game, as it was produced in *Novartis Pharm. Corp. v. Becerra*, No. 24-2234, 2024 WL 3823270 (D.D.C. Aug. 13, 2024), which was not constrained by the protective order in the Delaware MDL.  A persuasive argument can be made that a detailed written description of the dimensions, colors, and shapes of a drug is sufficient for purposes of determining whether a trade dress has been copied. Nonetheless, given the complexities of this case and the fact that the MSN Drug has not yet gone to market, the Court does not find the five-month delay precludes a finding of irreparable harm. Having so found, the Court turns to the actual theory of irreparable harm.

> b.    *Theory of reputational harm*

"Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill" and irreparable harm "can also be based on the possibility of confusion."  *S & R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 378 (3d Cir. 1992).  The *Becerra* court conducted a well-reasoned rejection of such a speculative theory of harm "that a brand-name manufacturer will lose general customer goodwill due to the deficiencies of a generic competitor."  2024 WL 3823270, at *6.  However, that case involved FDA's approval of the MSN Drug.  Instead, the Court is bound by a recognized theory of irreparable harm of "lack of control which potentially might result in a damaged reputation."  *Opticians Ass'n of Am. v. Ind. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990).  Relatedly, although the Court does not find that MSN necessarily intended to create a false impression that the MSN Drug is an authorized generic, rather than a bioequivalent, it finds the holding in *Astrazeneca* persuasive, that a misplaced affiliation with Novartis (and ENTRESTO® ) "puts at risk [Novartis's] reputation in the event of quality or safety issues with [MSN's] generic."

2015 WL 7307101, at *5.   Accordingly, Novartis has demonstrated a likelihood of irreparable harm.

### 5.    *Harm to defendants and public interest*

Having found the "gateway factors" in Novartis's favor, the Court must turn to the remaining two factors and determine in its discretion if all four balance in favor of granting injunctive relief.  *Reilly*, 858 F.3d at 179.   There is no question that MSN would suffer significant hardship if enjoined.  Opp'n at 36.   It would lose its "first mover advantage" and face financial, research, and development setbacks.   *Id.*   The Court is also mindful of the societal benefits of affordable alternatives to brand-name drugs and laments obstacles to such access.  *See Otsuka*, 99 F. Supp. 3d at 507.   However, it is axiomatic that "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself."  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002).   As noted *supra*, MSN could have distinguished its pills. Accordingly, on balance, a preliminary injunction is warranted and the Court will **GRANT** a preliminary injunction.

### B.    Trademark Infringement[4]

#### 1.    *There is no likelihood of confusion with the NOVADOZ mark*

The elements for a trademark infringement claim under the Lanham Act are the same for those under New Jersey statutory and common law.  *J&J Snack Foods, Corp. v. Earthgrains Co*., 220 F. Supp. 2d 358, 374 (D.N.J. 2002).  To establish such a claim, "a plaintiff must show that (1) it owns the mark; (2) its mark is valid and legally protectable; and (3) the Defendant's use of the

---

[4]   Trademark infringement and unfair competition share the same elements and analysis. *Checkpoint Sys., Inc. v. Check Point Software Tech., Inc*., 269 F.3d 270, 279 (3d Cir. 2001).

mark to identify its goods or services is likely to create confusion concerning the origin of those goods or services." *Id.*   MSN does not contest the first two elements, and instead argues that there is no likelihood of confusion between the parties' marks.  Opp'n at 29.  After analyzing the *Lapp* factors, the Court agrees.  As a threshold matter, Novartis adopts its same position of neutrality on factors 4 and 6 as argued in its trade dress position.  Mot. at 27, 33.

### a.    Factor 1: degree of similarity

NOVADOZ is likely not confusingly similar to NOVARTIS.  Novartis's arguments hinges on the fact that both words have three syllables, begin and end with similar sounds, and are coined words.  Mot. at 31 (citing *Kos*, 369 F.3d at 712-15).  In cases where the words contained the "same dominant syllable," they still gave the overall impression of similarity.  *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 184 (3d Cir. 2010) (ForsLean and Forsthin gave overall similar impressions, and notably, the words "lean" and "thin" are interchangeable terms to consumers). The Court is not persuaded that there is a "similarity between the visual appearance" or aural similarity of the words NOVADOZ and NOVARTIS.  *CPC Intern., Inc. v. Caribe Food Distribs.*, 731 F. Supp. 660, 665 (D.N.J. 1990) (Mazorca and Mazola look and sound alike).  The marks are distinguishable in "'appearance, sound and meaning[].'"  *Checkpoint Sys.*, 269 F.3d at 281 (quoting *Harlem Wizards Entm't Basketball, Inc. v. NBA Props., Inc.*, 952 F. Supp. 1084, 1096 (D.N.J. 1997)).  The Court is also less persuaded that the "Doz" portion of NOVADOZ will be perceived to derive from Novartis's previous generics division, Sandoz.  Mot. at 31.  It is satisfied with MSN's attestation that the name is a combination of "Nova," meaning bright new star, and "doz," which invokes the word "dose."  D.E. 13-2 ¶ 5.  This factor weighs against Novartis.

### b.    Factor 2: strength of mark

"To evaluate the strength of the mark, courts look at '(1) the mark's distinctiveness or conceptual strength (the inherent features of the mark) and (2) [the mark's] commercial strength

(factual evidence of marketplace recognition).'" *What a Smoke, LLC v. Duracell U.S. Operations, Inc.*, No. 19-16657, 2024 WL 1327976, at *8 (D.N.J. Mar. 27, 2024) (quoting *Freedom Card*, 432 F.3d at 472).  There is no dispute as to the ubiquity of the NOVARTIS trademark, given the company's massive profits and billions of dollars spent on marketing.  Mot. at 32.  However, as MSN points out, many marks begin with "Nov" or "Nova."  Opp'n at 30 (citing D.E. 13-26).  Novartis curiously dismisses third-party uses of the first three or four letters of the NOVARTIS mark and argues they do not undermine its strength, when it just made the argument that MSN has infringed because the first four letters of its mark are the same.  Reply at 10.  The Court is persuaded that there is enough evidence of third-party use of the prefix "Nov" or "Nova" so as to diminish the strength of the NOVARTIS mark.  *Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 94 (4th Cir. 1997); D.E. 13-26 (hundreds of trademarks with similar prefix).  This factor weighs against Novartis.

### c.    Factor 3: consumer care in purchase

This factor weighs in favor of MSN for the same reasons explained *supra*, Section IV.A.3.c.

### d.    Factor 5: intent to infringe

Novartis also adopts its argument on this element as proffered in its trade dress claim.  Mot. at 27, 33.  Previously, Novartis argued that MSN's knowledge of the trade dress demonstrated its bad faith and intention to copy the design.  *Id.* at 27.  The Court is unconvinced by Novartis's argument that MSN "hid" its planned use of NOVADOZ in connection with the MSN Drug by initially producing a label with the MSN mark.  Reply at 11.  It is satisfied with MSN's explanation for the name for purposes of the preliminary injunction motion, D.E. 13-2 ¶ 5, and notes that the name has been used since 2018.  Opp'n at 2.  This factor favors MSN.

> e.    *Factors 7-10: competition and overlap*

The Court adopts its discussion *supra*, Section IV.A.3.e and finds these factors weigh in favor of Novartis, which evens the score.  However, given "[t]he single most important factor in determining likelihood of confusion is mark similarity," which the Court found against Novartis, on balance, Novartis has not demonstrated a likelihood of confusion.  *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 216 (3d Cir. 2000).  Accordingly, the Court finds that Novartis is not likely to succeed on its trademark infringement claim (and resultingly, its state law claims) and will **DENY** its Motion to this extent.[5]

## V.    CONCLUSION

For the reasons stated above, the Court will **GRANT in part** and **DENY in part** Novartis's Motion for Preliminary Injunction.  An appropriate Order accompanies this Opinion.


Dated:  March 17, 2025

_Evelyn Padin_

Evelyn Padin, U.S.D.J.

---

[5] The Court recognizes that its holding above will enjoin MSN from putting the MSN Drug to market, functionally enjoining the use of the NOVADOZ name as well.

# EXHIBIT F

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| NOVARTIS AG and NOVARTIS PHARMACEUTICALS CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> NOVADOZ PHARMACEUTICALS LLC, *et al.*, <br><br> Defendants. | No. 25cv849 (EP) (JRA) <br><br> **ORDER** |

Plaintiffs Novartis AG and Novartis Pharmaceuticals Corporation move for a preliminary injunction against Defendants MSN Laboratories Private Limited, MSN Pharmaceuticals Inc., and Novadoz Pharmaceuticals LLC for alleged infringement of Plaintiffs' trademark and trade dress rights.  D.E. 4 ("Motion").  Having reviewed the parties' submissions and all other relevant items on the docket, and having determined that oral argument is not necessary,

**IT IS**, on this <u>**17**</u><sup>**th**</sup> day of March 2025, for the reasons set forth in the accompanying Opinion,

**ORDERED** that Plaintiffs' Motion for Preliminary Injunction, D.E. 4, is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Plaintiffs have not demonstrated a likelihood to succeed on the merits of their trademark infringement and state law claims; and it is finally

**ORDERED** that Defendants are **PRELIMINARY ENJOINED** from manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, or displaying the MSN Drug, in a manner likely to infringe on Plaintiffs' trade dress.

Evelyn Padin, U.S.D.J.